ROBERT M. MURPHY, Judge.
| ¿Defendants, Riverside Baptist Church of Jefferson. Parish (“Riverside”) and Guide One Specialty Mutual Insurance Company (collectively, “Defendants”), appeal from the trial court’s September 23, 2013 judgment rendered after a jury trial, as well as the trial court’s April 21, 2014 judgment granting the motion for judgment notwithstanding the verdict filed by Plaintiffs, Susan and Paul Skillman, individually and on behalf of their minor child, Kaitlyn Skillman (collectively, “Plaintiffs”). Plaintiffs also appeal the trial court’s September 23, 2013 and April 21, 2014 judgments. For the reasons that follow, we affirm the September 23, |¾2013 judgment. We affirm in part and vacate in part the April 21, 2014 judgment, and we render judgment as set forth herein.
FACTS AND PROCEDURAL HISTORY
This is a personal injury action arising out of an incident that occurred on September 27, 2010, when 19-month old Kait-lyn Skillman injured her arm in a fall from playground equipment at a daycare facility owned and operated by Riverside. On November 24, 2010, Kaitlyn’s parents, Paul and Susan Skillman, filed suit individually, and on behalf of Kaitlyn, against Riverside, Riverside’s liability insurer, Guide One, and two of Riverside’s employees, Ashley Pellegrin Cabal and Claire Simpson Kippes.[1]
The matter proceeded to a jury trial on September 9, 10 and 11, 2013. The testimony showed that Kaitlyn’s injury occurred while she was attending Riverside’s aftercare portion of its daycare program, which ran from 3:00 p.m. to 6:00 p.m. The age groups at the daycare ranged from eight weeks old to four years old. Claire Simpson Kippes (“Simpson”), the director of the daycare at the time of Kaitlyn’s incident, testified that the children played in two different playground areas based upon their ages. Children ages 18-months and younger played in one area that was surrounded by a fence, while children ages 18-months to three-years old played in *412 another area with a playset that contained two slides, a hanging bridge, stairs and monkey bars, surrounded by mulch. During the aftercare program, however, children of all ages were combined and played together in the area that contained the playset.
On the day of Kaitlyn’s incident, there were about fifteen children in aftercare, ranging in age from 19-months old to three or four-years old. Three aftercare teachers were supervising the children that day, but at the time of |4Kaitlyn’s fall, two of the three teachers were outside with the children, Ashley Pellegrin Cabal (“Pellegrin”) and Kristen Smith (“Smith”). Simpson testified that the state standards regarding the ratio of teachers to children requires one teacher to eight children for children aged 12 to 24-months old, and one teacher for twelve children for children aged 24 to 36-months old. With fifteen children in aftercare on the day of Kait-lyn’s fall, Simpson testified that Riverside was in compliance with those standards, even with only two of the three teachers being present at the time of her fall.
Neither Pellegrin, nor Smith witnessed Kaitlyn fall. Smith testified that she was bending over talking to another child when she heard a little girl behind her cry. She turned around and saw Kaitlyn on the ground right in front of the stairs of the playset. Smith then picked Kaitlyn up and brought her to Pellegrin because Pellegrin was Kaitlyn’s aftercare teacher.
Pellegrin testified that she was watching another group of children at the time of Kaitlyn’s fall. She heard Kaitlyn cry and turned towards her. She assumed that Kaitlyn fell from the steps of the playset because Kaitlyn was on the ground right next to the steps. Pellegrin saw Smith pick Kaitlyn up and bring her to Pellegrin, at which time, she checked Kaitlyn out, brushed the mulch off of her, and gave her T.L.C. (“tender loving care”).
Pellegrin testified that Kaitlyn’s mother Susan Skillman came three to five minutes later to pick her up, at which point, Pelleg-rin told Susan that Kaitlyn fell. Susan, who was employed by Riverside as its church secretary at the time, took Kaitlyn home, and she and her husband Paul Skill-man noticed that evening that Kaitlyn’s arm began to swell. Susan called Simpson and notified her that Kaitlyn’s arm was swelling.
IsAt trial, Simpson testified that at some point in time after Kaitlyn fell, she learned that the playset that Kaitlyn fell off of is recommended for children ages five years old and up. Although she was unaware of the age limitation prior to the accident, Simpson testified that as the director of Riverside’s daycare, it was her duty to provide safe and age appropriate playground equipment for the children. Both Simpson and Smith noted that prior to Kaitlyn’s fall, they witnessed Susan allow Kaitlyn to play on the playset at issue. However, Susan testified that she only allowed Kaitlyn to play around the playset, and denied that she ever let Kaitlyn play on the playset.
On the day after Kaitlyn’s fall, her parents too her to the emergency room where her arm was put in a cast and sling. On October 15, 2010, Dr. Stephen Heinrich, a pediatric orthopedic surgeon, examined Kaitlyn and determined that she had sustained a right lateral condyle fracture of the right distal humerus. Dr. Heinrich performed surgery on Kaitlyn that same day, followed by two more surgeries over the next four months.
During the first surgery on October 15, 2010, Dr. Heinrich performed an open reduction and internal fixation wherein he placed a screw, pin, wire and washer in Kaitlyn’s arm. Her arm was put in a cast *413 after the surgery. At the time of the second surgery on November 11, 2010, Dr. Heinrich removed the pin from her arm and then re-casted her arm. The third surgery was performed on February 8, 2011 to remove the screw and washer. Kaitlyn was placed under general anesthesia for all three surgeries. She also received physical therapy after her second surgery, which lasted from December of 2010 until February of 2011.
Dr. Heinrich testified that after Kait-lyn’s third surgery, she developed two deformities — (1) a bone prominence on the outside of her elbow, and (2) an angular deformity, or a bending of the arm, caused by the bone growing too fast on 1 fithe outside and too slow on the inside. Kait-lyn also has scarring from the three surgeries. Kaitlyn’s parents testified about their concern for her future as a result of her injury and subsequent deformities. Specifically, they worry about her being able to run, play the piano, type, swim and interact with other children without being questioned about the appearance of her arm. Susan testified that she feared Kait-lyn would walk down the aisle on her wedding day with her arm looking “like a teacup.”
Dr. Heinrich testified that Kaitlyn would have to undergo three to four future surgeries in order to return her arm to its pre-accident state. Specifically, in order to fix the angular deformity, Dr. Heinrich will have to re-break and re-set the bone in Kaitlyn’s arm, remove a wedge of bone, and then stabilize the bone using an external fixator, which would later have to be surgically removed. In order to fix the bone prominence, Dr. Heinrich will shave off the prominence using a saw. As for the scarring, Dr. Heinrich will surgically remove the scar and bring the two edges of normal tissue back together. When asked about the cost of these future surgeries, Dr. Heinrich stated that the surgery to repair Kaitlyn’s angular deformity would probably cost more than her October 15, 2010 surgery, which cost $23,242.50. As for the surgeries to repair her bone prominence and scarring, he testified that those surgeries would probably cost less than the cost of her October 15, 2010 surgery.
Dr. Heinrich described Kaitlyn’s deformities as cosmetic, but noted that as children age, they can develop pain as their muscles generate more force and as their activities increase. He testified that Kaitlyn’s parents noted that she had pain closely post-dating her surgeries, but that as she got further along, her parents did not inform him of any continuing complaints of pain. There were several notations within Dr. Heinrich’s progress notes indicating that Kaitlyn’s parents reported that|7she was doing well without any complaints of pain over the course of two and one half years after her first surgery. However, during a check-up on September 4, 2013, Kaitlyn’s parents reported that she experienced “overall fatigue associated with increased physical activities,” and “pain in her right elbow on a biweekly basis.”
Kaitlyn’s parents testified that she was in pain following her surgeries, as well as while she was undergoing physical therapy between her second and third surgeries. Paul Skillman testified that beginning in mid-2011, Kaitlyn complained of pain from time to time, which he and Susan thought was normal. Susan testified that she told someone on Dr. Heinrich’s staff about Kaitlyn’s pain. They noticed Kaitlyn began to experience more pain in the summer of 2013, when she became more active at the age of four.
At the conclusion of trial, the jury returned a verdict finding Riverside 100% at fault for the incident, and finding that the *414 individual defendants, Pellegrin and Simpson were not at fault. The jury declined to award Plaintiffs any general damages, but awarded them special damages in the amount of $47,036.88 in past medical expenses and $60,000 in future medical expenses. This award was subject to a stipulated credit for medical expenses in favor of defendants in the amount of $28,048.98. The trial court signed a judgment to this effect on September 23, 2013.
Subsequently, Plaintiffs filed a motion for judgment notwithstanding the verdict (“JNOV”), or in the alternative, a motion for new trial on the issue of quantum and/or additur. After a hearing on the merits, the trial court granted Plaintiffs’ motion for JNOV and denied their motion for new trial, finding that the jury’s failure to award Plaintiffs any general damages was contrary to- the law and evidence. The trial court further stated that when considering a motion for JNOV, |Rit is limited to raising the award for general damages to the minimum reasonable amounts for the injury at issue. Plaintiffs’ counsel argued that the trial court was not so limited when awarding damages after granting a motion for JNOV. However, the trial court disagreed and signed a judgment on April 21, 2014 granting JNOV in favor of Plaintiffs and awarding them a total of $225,000 in general damages, itemized as follows: (1) $25,000 for past pain and suffering; (2) $50,000 for future pain and suffering; and (3) $150,000 for disfigurement and scarring. Subsequently, Plaintiffs and Defendants each filed separate appeals in this matter as to the trial court’s September 23, 2013 and April 21, 2014 judgments.
ASSIGNMENTS OF ERROR
On appeal, Defendants allege the following assignments of error:
1. The jury erred in finding Riverside liable for this incident
2. The trial court erred in granting Plaintiffs’ motion for JNOV and awarding general damages
3. The trial court’s award of damages for scarring and disfigurement was improper or alternatively, excessively high
4. The trial court’s award of damages for future pain and suffering was excessively.high
5. The jury’s award for future medical expenses was excessive
6. The trial court erred in refusing to allow the jury to consider the fault of Susan Skillman
In their appeal, Plaintiffs allege the following assignments of error:
1. The jury erred in failing to find Claire Simpson Kippes and Ashley Pellegrin Cabal liable for this incident
2. The trial court erred in its inadequate award of general damages to Kaitlyn Skillman
3. The trial court erred in applying the incorrect standard in awarding general damages on the motion for JNOV
RLAW AND ANALYSIS
Both Plaintiffs and Defendants have raised assignments of error regarding the jury’s verdict on issues of liability, in addition to assignments of error regarding damages and the trial court’s grant of Plaintiffs’ motion for JNOV. We will first address the assignments of error regarding liability, and then we will address the assignments of error regarding damages and the JNOV.
*415 LIABILITY

Riverside and Guide One Liability:

In Defendants’ first assignment of error, they allege that the jury erred in finding Riverside liable for Kaitlyn’s incident. Specifically, Defendants contend that because the uncontroverted evidence establishes that Riverside complied with the state standards regarding the ratio of teachers to children at the time of Kait-lyn’s fall, Riverside fulfilled its duty of care and should not have been found liable.

Standard of Review

In the case of Rabalais v. Nash, 06-0999 (La.3/9/07), 952 So.2d 653, 657, the Louisiana Supreme Court once again set forth the standard of review to be applied to factual determinations of the trial court:
It is well-settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong. Blair v. Tynes, 621 So.2d 591, 601 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). To reverse a fact-finder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and that the record establishes that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120 (La.1987). Where the jury’s findings are reasonable, in light of the record viewed in its entirety, the court of appeal may not reverse. Even where the court of appeal is convinced that it would have weighed the evidence differently to reach a different result, reversal of the trial court is improper unless the trial court’s ruling is manifestly erroneous, or clearly wrong. Blair, supra. |inThe issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact-finder’s conclusion was a reasonable one. See Stobart v. State through Dept., of Transp. and Development, 617 So.2d 880 (La.1993) [citations omitted]. Where there are two permissible views of the evidence, the fact-finder’s choice cannot be manifestly erroneous or clearly wrong. Stobart, supra.
Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact-finder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, where conflict exists in the testimony. Rosell, supra', Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact-finder would not credit the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, supra.

Discussion

In an action to recover damages for injuries allegedly caused by another’s negligence, the plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence. Wiltz v. Bros. Petroleum, L.L.C., 13-332 (La.App. 5 Cir 4/23/14), 140 So.3d 758, 770-71, rehearing granting in part for clarification on other grounds and otherwise denied, 13-332 (La.5/21/14), 140 So.3d 758 (citing Hanks v. Entergy Corp., 06-477 (La.12/18/06), 944 So.2d 564, 578). In negligence cases, Louisiana employs a duty-risk analysis in determining whether to impose liability under La. C.C. art. 2315. Rando v. Anco Insulations Inc., 08-1163 (La.5/22/09), 16 So.3d 1065, 1086; Roberts v. Benoit, 605 So.2d 1032, 1057 (La.1992).
*416 In order for liability to attach under a duty/risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant’s substandard conduct was a cause-in-fact of the | ^plaintiffs injuries (the cause-in-fact element); (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element). Rando, supra at 1086 (citing Davis v. Witt, 02-3102 (La.7/2/03), 851 So.2d 1119, 1127).
In Wade ex rel v. Mini World, Daycare, 46,238 (La.App. 2 Cir. 3/13/11), 63 So.3d 1045, the Second Circuit discussed the duty/risk analysis in a personal injury action brought by a parent whose child fell and injured his tooth while under the care of a daycare facility. When evaluating the duty element of the duty/risk analysis, the court noted that “[tjemporary custodians of children, such as school personnel and daycare workers, .are charged with the highest degree of care toward the children left in their custody, but are not insurers of the children’s safety; supervisors must follow a standard of care commensurate with the age of the children under the attendant circumstances.” Wade, supra at 1047, (citing Glankler v. Rapides Parish School Bd., 610 So.2d 1020 (La.App. 3d Cir.1992), writ denied, 93-0017 (La.3/19/93), 614 So.2d 78). “This duty, however, does not require individual supervision of each child at all times and places.” Id.
In Wade, the appellate court found that the daycare owed a duty to the children under its care, but reversed the lower court’s finding of liability after concluding that the daycare did not breach its duty under the circumstances of the case. Id. at 1048-49. Specifically, the court noted that the evidence established that the ratio of children to teachers was within the state licensing requirements at the time of the accident, and that the plaintiffs child was engaged in typical child’s play in the playground when he fell. Id. at 1047-48. The court further emphasized that “[tjhere was no evidence that the daycare’s play area was unsafe.” Id. at 1048. Rather, the testimony showed that “the play area was a typical outdoor playground with grass and leaves on the ground.” Id. at 1049. Accordingly, the court held that l^the plaintiff failed to meet her burden of proof in establishing the daycare’s negligence. Id.
In the instant case, Simpson testified that the state standards regarding the ratio of teachers to children requires one teacher to eight children for children aged 12 to 24-months old, and one teacher for twelve children for children aged 24 to 36-months old. Defendants contend that because Riverside complied with these standards at the time of Kaitlyn’s accident, Riverside should not have been found liable for her resulting injury. We disagree. Contrary to Defendants’ argument, we find that a daycare’s duty to the children under its care extends beyond simply complying with the state standards for ratios of teacher to children.
For instance, unlike the play area in Wade, we find that there was evidence in this case that Riverside’s playset was unsafe for 19-month old children, such as Kaitlyn. Specifically, Simpson testified that after Kaitlyn fell from the playset, she learned that the playset was recommended for children ages five-years old and up. In an analogous case, the Third Circuit in Glankler v. Rapides Parish Sch. Bd., 610 So.2d 1020, 1032 (La.App. 3 Cir.1992), writ *417 denied, 93-0017 (La.3/19/93), 614 So.2d 78, held a school board liable for a child’s injuries, where the school board allowed the children to swing on swings that posed an unreasonable risk of harm to small children, despite the fact that reasonable supervision was provided. Similarly, although we agree that Riverside provided an appropriate number of teachers at the time of Kaitlyn’s fall, this does excuse Riverside from liability for Kaitlyn’s injuries where it allowed her to play on a playset that was unsafe for a child of her age.
Applying a duty/risk analysis to the facts of this case, and giving great deference to the jury’s factual findings, we find that Plaintiffs met their burden by a preponderance of the evidence that Riverside breached its duty of care to Kaitlyn |13by allowing her to play on a playset that was not age-appropriate for a 19-month old child. Therefore, we find no manifest error in the jury’s finding of liability on behalf of Riverside for Kaitlyn’s injuries.

Pellegrin and Simpson Liability:

In their first assignment of error, Plaintiffs contend that the jury erred in failing to find Pellegrin or Simpson at fault for Kaitlyn’s injuries. Plaintiffs allege that the jury erred in failing to find Pelleg-rin negligent because she faded to properly supervise Kaitlyn at the time of her fall. As for Simpson, Plaintiffs argue that the jury erred in failing to find her negligent because, as the director of the daycare, Simpson should have known that the play-set at issue was not age-appropriate for a 19-month old.
It is well-settled that a court of appeal may not set aside a jury’s finding of fact in the absence of manifest error. See Rabalais, siipra. At trial, the jury heard testimony that the ratio of teachers to children at the time of Kaitlyn’s fall was appropriate. Pellegrin testified that the teachers intentionally spread out in the playground in order to provide wider supervision of the children, and that she was watching another group of children at the time Kaitlyn fell. The jury also heard testimony that the playset had been at Riverside for approximately fifteen years.
Based upon our review of the record, we find that the jury’s finding of no individual liability on behalf of Pellegrin and Simpson is reasonable. Plaintiffs have not shown the absence of a reasonable factual basis for the jury’s conclusion that Pellegrin and Simpson were not negligent with respect to Kaitlyn’s injury, nor have they cited any cases where individual employees, such as Pellegrin and Simpson, were found liable under similar circumstances. Rather, Plaintiffs’ argument only establishes a factual basis for Riverside’s liability for Kait-lyn’s |uinjury, which we have already affirmed herein. Therefore, this assignment of error is without merit.

Susan Skillman’s Fault:

In their sixth assignment of error, Defendants contend that the trial court erred in refusing to allow the jury to consider Susan Skillman’s fault in connection with Kaitlyn’s accident. Specifically, Defendants argue that if this Court upholds Riverside’s liability for allowing Kaitlyn to play on a playset that was not appropriate for her age, then this case should be remanded to the trial court for the purpose of considering Susan’s fault for also allowing Kaitlyn to play on the same playset.
A trial court has discretion in determining the contents of a jury verdict form, thus, the standard of review is whether the trial court abused that discretion. Richard v. Artigue, 11-1471 (La.App. 3 Cir. 4/4/12), 87 So.3d 997, 1001. The trial court is bound to instruct the jury only on the law which pertains to the evidence adduced in that particular case. Giarratano v. Krewe of Argus, Inc., 449 *418 So.2d 530, 533 (La.App. 5 Cir.1984), writ denied, 456 So.2d 170 (La.1984). Further, this Court has held that it is reversible error for a trial court to include a party on a jury interrogatory form where the record does not contain evidence of that party’s fault. See Willis v. Noble Drilling, Inc., 11-598 (La.App. 5 Cir. 11/13/12), 105 So.3d 828, 842.
In the instant case, there was no evidence showing that Susan was present on the playground at the time of Kaitlyn’s fall, or that she was employed by Riverside’s daycare facility in any capacity. Rather, the evidence established that Susan came to the playground after the accident occurred to pick up Kaitlyn, and that she was employed by Riverside as its church secretary. Therefore, our review shows that the record does not contain any evidence of Susan’s fault in connection 11swith the incident at issue, regardless of whether she allowed Kaitlyn to play on the playset prior to the incident in a one-on-one setting with Susan watching only Kait-lyn the entire time. Based upon our review of the record, we find no abuse of discretion in the trial court’s exclusion of Susan Skillman from the jury verdict form. Therefore, this assignment of error is without merit.
DAMAGES
We now turn to the issues raised on appeal involving damages and the trial court’s grant of JNOV in favor of Plaintiffs. We will first address the assignment of error not subject to the JNOV, and then we will turn to the assignments of error that are subject to the JNOV.

Future Medical Expenses:

In their fifth assignment of error, Defendants contend that the jury’s award of $60,000 for future medical expenses was excessive and not properly supported by the record, where Plaintiffs failed to provide any testimony concerning the actual cost of Kaitlyn’s future surgeries.
A plaintiff is required to prove special damages by a preponderance of the evidence, and the findings of the trier of fact are subject to the manifest error standard of review. Williams v. Walgreen La. Co., 14-716, *13 (La.App. 5 Cir 2/25/15), 168 So.3d 819-820, 2015 La.App. LEXIS 297. In order to recover future medical expenses, the plaintiff must prove that these expenses will be necessary and inevitable. Gunn v. Robertson, 01-347 (La.App. 5 Cir. 11/14/01), 801 So.2d 555, 564, writ denied, 02-0170, and 02-176 (La.3/22/02), 811 So.2d 942. Future medical expenses must be established with some degree of certainty and must be supported with medical testimony and estimation of probable costs. Id. The plaintiff bears the burden of proving entitlement to future medical expenses by a preponderance of the evidence. Dufrene v. Gautreau Family, LLC, 07-467 (La.App. 5 Cir. 2/22/08), 16980 So.2d 68, 83, writ denied, 08-0629 (La.5/9/08), 980 So.2d 694, and writ denied, 08-0628 (La.5/9/08), 980 So.2d 698. A fact-finder may accept or reject the opinion expressed by an expert, in whole or in part. Id.
Upon review of the record, we do not find the jury’s award of $60,000 for future medical expenses to be manifestly erroneous. Dr. Heinrich testified that three to four future surgeries will be necessary to return Kaitlyn’s arm to its pre-accident state. He explained that these surgeries are needed to repair Kaitlyn’s bone prominence, angular deformity and scarring. When asked about the cost of these surgeries, Dr. Heinrich testified that the surgery to repair Kaitlyn’s angular deformity would probably cost more than the cost of her initial surgery of approximately $24,000, and that the surgeries to repair *419 her bone prominence and scarring would probably cost less than the initial surgery.
The jury clearly accepted Dr. Heinrich’s testimony that the future surgeries were necessary, and awarded damages for the cost of those surgeries based upon his estimation of the same. Plaintiffs are not required to present testimony of the “actual cost” of the surgeries, as Defendants contend. Rather, they must establish future medical expenses, by a preponderance of the evidence, with medical testimony and an estimation of probable the cost. See Gunn, supra. Because the record shows that Plaintiffs have met their burden of establishing the necessity and probable cost of Kaitlyn’s future medical expenses, we find no manifest error in the jury’s award of $60,000 for future medical expenses. Accordingly, this assignment of error is without merit.

JNOV:

Both Plaintiffs and Defendants have assigned errors on appeal attacking the damages awarded by the trial court in its April 21, 2014 judgment granting JNOV in favor of Plaintiffs. In their second, third and fourth assignments of error, |17Pefendants allege that the trial court erred in granting JNOV, and in awarding general damages which they contend are excessively high. Conversely, Plaintiffs contend in their second and third assignments of error, that the trial court erred by applying the wrong standard in its grant of JNOV, and by awarding inadequate general damages.

JNOV Standard of Review

Louisiana Code of Civil Procedure article 1811 governs a motion for JNOV. A JNOV may be granted on the issue of liability or on the issue of damages or on both. Anderson v. New Orleans Pub. Serv. Inc., 583 So.2d 829, 833 (La.1991); La. C.C.P. art. 1811(F). In Williams v. Walgreen La. Co., supra at 819, this Court reiterated the standard of review for determining when a JNOV has been properly granted:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Davis v. Wal-Mart Stores, Inc., 00-0445 (La.11/28/00), 774 So.2d 84, 89; Scott v. Hospital Serv. Dist. No. 1, 496 So.2d 270 (La.1986).
The standard of review for a JNOV on appeal is a two part inquiry. In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether or not to grant the motion. After determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. Davis v. Fenerty, 04-283 (La.App. 5 Cir. 12/14/04), 892 So.2d 55, 58; Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991).
*420 | wTrial Court’s Grant of JNOV on General Damages
To begin, we must first determine whether the trial court erred in granting the JNOV. If we find that the JNOV was properly granted, we will then turn our review to the damages awarded in the JNOV.
After the jury in this case awarded Plaintiffs special damages, but failed to award any general damages, Plaintiffs moved for JNOV on the issue of general damages. The trial court granted Plaintiffs’ motion for JNOV, finding that Kait-lyn was entitled to general damages for her pain and suffering, and for her scarring and disfigurement. In determining Plaintiffs’ general damages award, the trial court stated that it was limited to awarding Plaintiffs the minimum reasonable amount for each award. The trial court awarded Plaintiffs a total of $225,000 in general damages, itemized as follows: (1) $25,000 for past pain and suffering, (2) $50,000 for future pain and suffering, and (3) $150,000 for scarring and disfigurement.
Defendants argue that the trial court improperly granted JNOV because the evidence established an appropriate basis for the jury to refrain from awarding Plaintiffs any general damages. In Wainwright v. Fontenot, 00-0492 (La.10/17/00), 774 So.2d 70, the 'Louisiana Supreme Court held that a verdict awarding medical expenses yet denying general damages is not per se invalid. Rather, the Court emphasized that a reviewing court faced with such a verdict must ask whether the jury’s determination that a plaintiff is entitled to certain medical expenses but not to general damages is so inconsistent as to constitute an abuse of discretion. Id. at 76.
Here, the evidence established that Kaitlyn sustained a broken arm at the age of 19-months, and subsequently underwent three surgeries under general anesthesia. Her parents, as well as Dr. Heinrich, testified that she experienced pain closely post-dating those surgeries. Kait-lyn also received several months of |19physical therapy, during which, her father testified she experienced pain. Dr. Heinrich further testified that Kaitlyn will need three to four additional surgeries in the future to correct her angular deformity, bone prominence and scarring. Our review of the record shows that Plaintiffs clearly established that Kaitlyn experienced pain associated with her previous surgeries and physical therapy, and thus, will more likely than not experience similar pain associated with her future surgeries.
With respect to whether Kaitlyn experienced pain not directly related to her recovery from the surgeries, we note that her parents testified that she did complain of such pain, but that those complaints do not appear in Dr. Heinrich’s progress notes until her last visit prior to trial. Nevertheless, we do not find that this warrants the jury’s denial of general damages in this case. ■ Despite the lack of pain noted in her medical records, both of Kait-lyn’s parents testified that her pain began to increase in the summer prior to trial when she reached the age of four-years old, which is consistent with Dr. Heinrich’s testimony that children can develop pain as their muscles generate more force and as their activity level increases. Although we agree that the record does not support a finding that Kaitlyn was experiencing frequent or extensive pain associated with her injury and/or her resulting deformities, it also does not support a finding that she was free from any and all such pain.
Based upon our review of the record, we find that the jury’s verdict awarding Plaintiffs medical expenses, but no general damages, is inconsistent in light of the *421 record, and thus, constituted an abuse of its discretion. Therefore, we find that the trial court properly granted Plaintiffs’ motion for JNOV because the facts and inferences point so strongly and overwhelmingly in favor of Plaintiffs.
Iso Trial Court’s Award of General Damages on JNOV
Having determined that the trial court properly granted JNOV as to general damages, we now turn our review to the general damages awarded by the trial court in the JNOV. As set forth above, the trial court awarded Plaintiffs a total of $225,000 in general damages in the JNOV, itemized as follows: (1) $25,000 for past pain and suffering, (2) $50,000 for future pain and suffering, and (3) $150,000 for scarring and disfigurement. Defendants complain that the general damages awarded by the trial court in the JNOV were excessive, while Plaintiffs complain that the damages awarded were inadequate and that the trial court erred by applying the wrong standard to its assessment of general damages.
In this case, Plaintiffs contend that the general damages awards provided in the JNOV were made in error because in rendering those awards, the trial court applied the wrong standard by limiting itself to only awarding the minimum reasonable amounts for each category of damages.
Once a trial court concludes that a JNOV is warranted, it must then determine the proper amount of damages to be awarded. Anderson, supra at 833. In making this determination, the trial court is not constrained as the courts of appeal are to raising (or lowering) the award to the lowest (or highest) point which is reasonably within the discretion afforded that court, as set forth in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Id. Rather, after rendering a JNOV, the trial court substitutes itself for the trier of fact and renders a de novo award of damages based upon its independent assessment of the injuries. Id. at 834.
In Rickerson v. Fireman’s Ins. Co., 543 So.2d 519, 523 (La.App. 1 Cir.1989), the First Circuit determined that the trial court committed legal error when, after properly granting a JNOV on the issue of damages, the trial court held that it was limited to increasing the amount of general damages awarded by the jury to 12i “the minimum award allowable” for the type of injury at issue. On appeal, the First Circuit emphasized that “[t]he Coco standard of review does not apply to a trial court’s review of a jury’s award ... [therefore, after rendering the JNOV, the trial court should have rendered a de novo award based upon his independent assessment of injuries and damages.” Id. Based upon the trial court’s legal error, the First Circuit rendered a de novo award of general damages, finding that “[w]hen an appellate court has all of the pertinent facts that are needed to render judgment, it should render a judgment rather than remand the case for a new trial.” Id. (citing Gonzales v. Xerox Corp., 254 La. 182, 320 So.2d 163, 165 (1975)).
A legal error occurs when a trial court applies incorrect principles of law and such error is prejudicial. Rhodes v. Schultis, 13-663 (La.App. 5 Cir 4/23/14), 140 So.3d 331, 337, writ denied, 14-1081 (La.9/12/14), 148 So.3d 937. Legal errors are prejudicial “when they materially affect the outcome and deprive a party of substantial rights.” Id. (citing Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731, 735.) When a prejudicial error of law skews the trial court’s factual findings and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by apply *422 ing the correct law and determining the essential material facts de novo. McKenzie v. Evans Quality Temps., 99-518 (La.App. 5 Cir. 10/26/99), 746 So.2d 163, 169 (citing Evans, supra).
Based upon our review of the instant case, we find that the trial court committed a legal error when, after properly granting the JNOV, it erroneously limited Plaintiffs’ general damages awards to the minimum amounts for each category of damages. Because the proper standard required the trial court to render a de novo award based upon its independent assessment of the injuries and damages, we find that the trial court’s legal error clearly prejudiced Plaintiffs. See Anderson, supra at 834; Rickerson, supra at 523. Therefore, this legal error requires the trial court’s l^award of general damages in the JNOV to be set aside. Because the record is complete, it is incumbent upon this Court to conduct a de novo review of Plaintiffs’ damages, substituting ourselves for the trier of fact, and render a de novo award of general damages based upon our independent assessment of Kaitlyn’s injuries and damages. See Rickerson, supra at 523; McKenzie, supra at 169; Mart v. Hill, 505 So.2d 1120, 1128 (La.1987) (holding that when an appellate court conducts a res nova review of quantum to compensate a plaintiff for damages that the trial court erroneously failed to award, the appellate court should award damages based upon its independent evaluation of the record).

Past Pain and Suffering

As set forth above, our review of the record shows that Kaitlyn sustained a right lateral condyle fracture of her distal right humerus at 19 months of age, which required three surgeries under general anesthesia. The first surgery consisted of. an open reduction and internal fixation wherein a screw, pin, wire and washer were placed in Kaitlyn’s arm, followed by two more surgeries to remove the hardware from her arm. Kaitlyn also underwent physical therapy for about two months. The record shows that Kaitlyn experienced pain closely post-dating her surgeries and during her physical therapy. While at 19 months of age, Kaitlyn was not necessarily capable of fully articulating her pain and suffering, the evidence indicates that she indeed suffered and that she was more easily able to articulate her pain and suffering as she grew older. Based upon our independent assessment of Kaitlyn’s injuries and damages, we find that $150,000.00 is an appropriate award for Kaitlyn’s past pain and suffering.

Future Pain and Suffering

Following her three surgeries, Kaitlyn developed two deformities: (1) a bone prominence on the outside of her elbow; and (2) an angular deformity, or a bending l^of the arm. Kaitlyn also has scarring from her three surgeries. Dr. Heinrich testified that Kaitlyn will have to undergo three to four future surgeries, all performed under general anesthesia, to correct those deformities and her scarring. First, in order to fix the angular deformity, Dr. Heinrich "will have to re-break and re-set the bone in Kaitlyn’s arm, remove a wedge of bone, and then stabilize the bone using an external fixator, which will later need to be surgically removed. In order to fix the bone prominence, Dr. Heinrich will have to shave off the prominence using a saw. As to the scarring, Dr. Heinrich will surgically remove the scar and bring the two edges of normal tissue back together. .Based upon our independent assessment of Kaitlyn’s injuries and damages, we award Plaintiffs $150,000.00 for Kaitlyn’s future pain and suffering.

*423
Scarring and Disfigurement

Kaitlyn’s arm is currently both scarred and disfigured. Dr. Heinrich testified that three or four surgeries will be required to correct the disfigurement and reduce the scarring. Dr. Heinrich also testified that while the scar revision surgery will minimize her scarring, she will always have a scar. He indicated that the future surgeries will likely correct the deformities and return her arm to its pre-accident state, but that he could not say with one hundred percent certainty that they would, or when the surgeries would take place. Based upon our independent assessment of Kaitlyn’s injuries and damages, we award Plaintiffs $25,000 for Kait-lyn’s scarring and disfigurement.
For the reasons set forth above, we award Plaintiffs general damages in the following amounts:
Past pain and suffering: $150,000
Future pain and suffering: $150,000
Scarring and disfigurement: $25,000
Total: $325,000
124Therefore, we render a judgment in favor of Plaintiffs and against Defendants in the amount of $325,000 in general damages.
Accordingly, we pretermit any discussion of Plaintiffs’ and Defendants’ remaining assignments of error regarding the propriety of the damage awards provided in the JNOV.
CONCLUSION
For the foregoing reasons, we affirm the September 23, 2013 judgment of the trial court. With respect to the April 21, 2014 judgment of the trial court, we affirm the judgment in part as it relates to the grant of the JNOV in favor of Plaintiffs, and we vacate the judgment in part as it relates to Plaintiffs’ general damages award of $225,000. We further render a judgment in favor of Plaintiffs, Susan and Paul Skill-man, individually and on behalf of their minor child, Kaitlyn Skillman, and against Defendants, Riverside Baptist Church of Jefferson Parish and Guide One Specialty Mutual Insurance Company, in the amount of $325,000 in general damages. Each party shall bear their own costs of this appeal.

AFFIRMED IN PART: VACATED IN PART: AND RENDERED

WICKER, J., concurs in part with reasons.

. Plaintiffs also filed suit against Hartford Life and Accident Insurance Company, but subsequently resolved and dismissed their claims against Hartford with prejudice on April 4, 2011.