CHAISSON, J.
11 In this medical malpractice suit, Susan Deykin, Herbert Deykin, III, Neil Deykin, and Donna Deykin Moore, the surviving children of decedent Herbert Deykin, Jr. (“Mr. Deykin”), appeal the judgment of the trial court rendered following the jury’s verdict in favor of Ochsner Clinic Foundation d/b/a Ochsner Medical Clinic (“Ochs-ner”). For the following reasons, we affirm the judgment of the trial court.
*1237 FACTS AND PROCEDURAL HISTORY
This suit arises from the death of Mr. Herbert Deykin, Jr., following an elective bilateral knee replacement surgery on December 30, 2008, at Ochsner Medical Center. At the time of the surgery, Mr. Dey-kin was an 83-year-old man with a history of blood pressure and cardiac ailments, including atrial fibrillation, hypotension, hy-perlipidemia, and syncope. Mr. Deykin and his daughter, Susan, met with Dr. George Chimento, an orthopedic surgeon, on November 17, 2008, to discuss knee replacement surgery to address Mr. Dey-kin’s ambulatory difficulties and severe knee arthritis. Mr. Deykin elected to undergo the bilateral knee replacement surgery, which was scheduled for December 30, 2008, pending appropriate clearances.
Initial pre-operative clearances began on December 3, 2008, with an evaluation by Mr. Deykin’s primary care physician, Dr. J.' Steven Granier. Dr. Granier noted Mr. Deykin’s atrial fibrillation and performed a physical examination and an EKG, both of which were stable. Additional testing, including chest x-rays and blood work, were ordered. Dr. Granier medically cleared Mr. Deykin. for surgery pending' clearance from cardiology. At that time, Dr. Granier also recommended that Mr. Deykin be given a pre-operative steroid. A cardiology evaluation was performed that same day by Stephanie Ryan, PhD, a nurse practitioner in the cardiology clinic, who evaluated Mr. Deykin using the 2007 ^American College of Cardiology/American Heart Association Guidelines for Perioperative Cardiovascular Evaluation and Care for Non-cardiac Surgery. Ms. Ryan reviewed Mr. Deykin’s medical history, which included his chronic conditions of atrial fibrillation, syncope, dizziness, orthostatic hypotension, and hyperlipidimia, all of which were noted as stable and normal after a physical examination. Following the guidelines, Ms. Ryan cleared Mr. Deykin for the knee surgery. There were additional pre-opera-tive consultations on December 12, 2008. Dr. Jack Rentz completed a pre-anesthétic medical history and physical at which time he noted the potential'problems of atrial fibrillation, hypotension, . hyperlipidemia, frequent syncope and loss of balance. He also discussed with Mr. Deykin and his daughter different anesthesia alternatives and their associated risks. On that- same day, Mr. Deykin again met with Dr. Chi-mento, who discussed with him the risks associated with the surgery. Mr. Deykin was provided with a patient consent to medical treatment form for the bilateral knee surgery .'as well as a patient consent to anesthesia form, both of which outline the material risks of the recommended treatments and procedures. Both were signed by Mr. Deykin.
Mr. Deykin was admitted to Ochsner Medical Center for surgery on the morning of December 30, 2008. Prior to surgery, Dr. Michael Sprintz, the anesthesiologist for the surgery, evaluated Mr. Deykin. The evaluation included a physical examination, patient interview, and a review, of the pre-operative anesthesia notes. Mr. Deykin was not given the steroid dose recommended by Dr. Granier prior to surgery, but it was given following surgery. Dr. Sprintz administered spinal epidural anesthesia for the duration of the approximately three-hour long operation and monitored Mr. Deykin’s heartbeat and blood pressure using an arterial line. There were no complications during the bilateral knee replacement surgery, which was performed by Dr. Chimento with the assistance of Dr. Lucas Romine. Upon completion of the surgery, Mr. Dey-kin was noted to be lain hemodynamically stable condition and was taken to the post-anesthesia care unit (PACU) for recovery around 11:00 a.m.
Upon entering the PACU, Mr. Deykin was initially awake and alert; however, he *1238 soon -began experiencing fluctuations in his blood pressure and a decline in his alertness and responsiveness. Dr. Sprintz was called to Mr. Deykin’s bedside ■ around 12:05 p.m., at which time he ordered eight doses of neo-synephrine vassopressers and a liter of Hespan.[1] In response to this treatment, Mr. Deykin’s blood pressure returned to normal levels. At the time that Dr. Sprintz’s shift ended around 1:00 p.m., Mr. Deykin appeared to bé in stable condition. Dr. Chimento had been at Mr. Dey-kin’s bedside at the same time as Dr. Sprintz, and they conferred regarding Mr. Deykin’s condition. Following Dr. Sprihtz’s departure at 1:00 p.m., Mr. Deykin’s blood pressure began dropping again. At 1:30 p.m., Dr. Chimento ordered additional Hespan. By 2:00 p.m., Mr. Deykin had become unresponsive and his blood pressure continued to drop. Over the course of the next few hours, the attending doctors in the PACU gave Mr. Deykin- several rounds of Hespan fluid in an attempt to elevate his blood pressure. At around 6:30 p.m., Mr. Deykin was transferred to the surgical intensive care unit (SICU) under the care of Dr. Bobby Nossaman. Shortly after his transfer to the SICU, Mr. Deykin suffered an acute coronary artery thrombosis and died. Following Mr. Deykin’s death, the hospital informed the surviving family members that they could request an autopsy, but they declined to make such a request. No autopsy was performed.
On April 5, .2011, Mr. Deykin’s surviving children filed a petition for damages against Ochsner Medical Center, Dr. Chi-mento, Dr, Romine, Dr. Sprintz, and their insurer, in which they claimed that both the hospital and the doctors had committed medical malpractice. Specifically, they allege that defendants failed to obtain proper informed consent from Mr. Deykin prior to surgery, failed to | ¿properly evaluate and treat Mr. Deykin during and following the surgical procedure, failed to follow specific recommendations of other health care providers, and failed to properly review Mr. Deykin’s chart/medical history, along with additional acts of. negligence.[2]
Seven days before trial began, both plaintiffs and defendants submitted proposed jury charges and jury verdict forms pursuant to a joint pre-trial order. Also prior to trial, following a stipulation that the hospital was responsible for any negligence of the doctors under the theory of respondeat superior, the .claims against the doctors in their individual capacities were dismissed on joint motion of the parties, so that the case proceeded to trial only against the hospital. After a four-day trial, the jury returned,a verdict in favor of Ochsner. In accordance with this verdict, the trial court entered a judgment in favor of Ochsner and dismissed all of plaintiffs’ claims with prejudice. Plaintiffs filed a motion for judgment notwithstanding the verdict and/or a motion for new trial*, which were denied by the trial court. This timely appeal followed.
On appeal, plaintiffs present three assignments of error:
1) Whether fundamental error occurred by failing to include jury instructions and jury interrogatories regarding loss of chance of survival in a medical malpractice action that'mandates overturning the jury’s verdict;
2) Whether the jury’s verdict on informed consent should be overturned *1239 because it was manifestly erroneous or clearly wrong; and
3) Whether fundamental error occurred by failing to include informed consent on the jury interrogatories.
We begin our discussion by addressing plaintiffs’ -first and third assignments of error relating to the jury instructions and jury interrogatories before addressing the second assignment of error relating to the jury’s verdict on informed consent.
I «DISCUSSION

Jury Instructions and Interrogatories

La. C.C.P. art. 1792(B) requires the district judge to instruct the jury on the law applicable to the cause submitted to them. Wooley v. Lucksinger, 09-0571, c/w 09-584, 09-585 and 09-586 (La. 4/1/11), 61 So.3d 507, 573. In addressing the question of whether the trial judge adequately instructed the jury, the Louisiana Supreme Court defined adequate jury instructions as follows:
[ajdequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues. The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury. If the trial court omits an applicable, essential legal principle, its instruction does not adequately set forth the issues to be decided by the jury and may constitute re- . versible érror, (citations omitted)
Wooley, 61 So.3d at 574.
In this case, plaintiffs argue that by omitting their proposed jury charge on loss of a chance of survival, the trial judge did not adequately set forth the issues to be decided by the jury. Additionally, they argue that, even though the jury received instructions on the applicable law of informed consent, because the jury interrogatories made no separate and distinct inquiry regarding failure to obtain informed consent, the jurors were prevented from making any determination on that issue, or assessing any damages arising therefrom.'
Under La. C.C.P. art. 1793(C), “[a] party may not assign as error the giving or failure to' give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds for his objection.” In order to preserve the right to appeal a trial court’s failure to give a requested instruction or its giving of an erroneous instruction, a party must make a timely objection and state the grounds for that objection. Willis v. Ochsner Clinic Found., 613-627 (La.App. 5 Cir. 4/23/14), 140 So.3d 338, 348-49. This rule'also applies to jury interrogatories. Id. Moreover, objections must be specific to allow the trial judge a fair opportunity to correct any error before jury deliberations. Fields v. Walpole Tire Serv., L.L.C., 45,206 (La.App. 2 Cir. 5/19/10), 37 So.3d 549, 560. It is only when jury instructions or interrogatories contain a “plain and fundamental” error that the contemporaneous objection requirement is relaxed and appellate review is not prohibited, Berg v. Zummo, 00-1699 (La. 4/25/01), 786 So.2d 708, 716, n. 5.
The record in this case is clear that the trial judge gave plaintiffs the opportunity to object to the jury instructions and interrogatories before closing arguments. Plaintiffs made no objection. In fact, plaintiffs’ counsel specifically stated, “Your Honor, we’re satisfied with the jury instructions and the jury interrogatories.” Plaintiffs, however, contend that the failure of the trial court to give their requested jury instruction regarding loss of a chance of survival constitutes “plain and fundamental” error for which we should relax the contemporaneous objection requirement and allow appellate review. We disagree.
*1240 In support of their argument that the trial court’s omission constitutes “plain and fundamental” error, plaintiffs cite this Court’s decision in Matranga v. Par. Anesthesia of Jefferson, LLC, 14-448 (La.App. 5 Cir. 5/14/15), 170 So.3d 1077. Specifically, plaintiffs argue that “Matranga establishes that loss of chance of survival instructions are required in cases claiming malpractice resulting in death.” (emphasis added). Plaintiffs misconstrue our opinion in Matranga as it relates to the loss of a chance of survival doctrine. Although a claim involving death is a necessary element of a loss of a chance of survival claim, not every malpractice claim involving death necessarily implicates the loss of a chance of surviyal doctrine, or necessitates the giving of a loss of a chance of survival instruction. Only in malpractice' cases involving death where the evidence presented indicates |7that the loss of a chance of survival doctrine is applicable is it appropriate to give such an instruction.
In Smith v. Department of Health & Hosps., 95-0038 (La. 6/25/96), 676 So.2d 543, the Louisiana Supreme Court noted that on several occasions it has recognized the right to recover damages in medical malpractice cases for the loss of a chance of survival, citing Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La. 1986); Smith v. State through Dept. of Health & Human Resources Admin., 523 So.2d 815 (La. 1988); Martin v. East Jefferson Gen. Hosp., 582 So.2d 1272 (La. 1991); and Ambrose v. New Orleans Police Dept. Ambulance Serv., 93-3099, 93-3110, 93-3112 (La. 7/5/94), 639 So.2d 216. The Supreme Court explained a plaintiffs burden of proof in a loss of a chance of survival claim as follows:
Thus, in a medical malpractice case seeking damages for the loss of a less-than-even chance of survival because of negligent treatment of a pre-existing condition, the plaintiff must prove by a preponderance of the evidence that the tort victim had a chance of survival at the time of the professional negligence and that the tortfeasor’s action or inaction deprived the victim of all or part of that chance, and must further prove the value of the lost chance, which is the only item of damages at issue in such a case.
Smith v. Department, 676 So.2d at 547.
The rationale for the loss of a chance of survival doctrine is that a plaintiff, in order to establish causation in a situation where the patient dies,, should only need to prove that the defendant’s malpractice resulted in the patient’s loss of a chance of survival, and should not shoulder the “unreasonable burden” of proving that the patient would have survived if properly treated. Martin, 582 So.2d at 1278.
These pronouncements from the Supreme Court lead us to conclude that the loss of a chance of survival doctrine is relevant in cases involving the following factual elements: (1) the death of the patient as the probable result of a pre-exist-ing condition (i.e., a condition of the patient in existence at the time of the |salleged malpractice of the defendant, which condition is unrelated to any conduct of the defendant);[3] (2) some chance of the *1241 patient surviving the pre-existing condition, although a less-than-even chance, at the time of the defendant’s alleged malpractice;[4] and (3) the loss of all or a part of that chance of survival caused by the defendant’s negligent action or inaction. See Smith v. Department, 676 So.2d at 547. Without the presentation of evidence in support of these factual elements, a plaintiffs claim is not one for loss of a chance of survival, and a jury instruction on that doctrine would not be appropriate.
In the case before us, we first note that plaintiffs did not specifically and concisely plead a cause of action for loss of a chance of survival in their petition for damages. Although the failure to specifically and concisely plead that cause of action is not dispositive of the issue of whether it was “plain and fundamental” error for the trial court to not give a loss of a chance of survival instruction to the jury, it is nevertheless a factor we consider.[5] Of crucial importance however, is that plaintiffs did not present evidence to the jury in support of a loss of a chance of survival claim. From a thorough review of the record, it is abundantly clear, particularly through the testimony of plaintiffs’ sole medical expert, Dr. Richard Novak, that the theory of the case pursued by plaintiffs was that defendants overloaded Mr. Deykin with excessive fluids,' which caused his heart to stop functioning, resulting in cardiac arrest and death. Plaintiffs presented no evidence |9whatsoever regarding what chance Mr. Deykin had of surviving his long-standing cardiac issues (or any of his other pre-existing medical issues) at the time of defendants’ alleged malpractice. It is this complete lack of evidence in support of a loss of a chance of survival claim that compels us to conclude that there was no “plain and fundamental” error on the part of the trial judge in declining to give a jury instruction on that doctrine. In reaching this conclusion, we are mindful of the Supreme Court’s statement on the well-established principle in Louisiana jurisprudence that a reviewing court must exercise great restraint before it reverses a jury verdict due to an allegedly erroneous jury instruction. Wooley, 61 So.3d at 574.
Plaintiffs also assign as error the trial judge’s failure to include a separate and distinct inquiry on the jury interrogatory form regarding failure to obtain informed consent. They argue that the failure to include this separate and distinct inquiry prevented the jurors from making any determination on that issue, or assessing any damages arising therefrom. They further- argue that this omission was a “plain and fundamental” error that necessitates' reversal of the jury’s verdict, de- *1242 spite the fact that they made no contemporaneous objection to the omission.
“A trial court has discretion in determining the contents of a jury verdict form, thus, the standard of review is whether the trial court abused that discretion,” Skillman v. Riverside Baptist Church of Jefferson Parish, 14-727 (La. App. 5 Cir. 5/28/15), 171 So.3d 407, 417. “When one cause of action is asserted (such as medical malpractice by negligence) which can be proved in more than one way (as by lack of skill and informed consent), the trial court has the discretion to submit one interrogatory to the jury on the cause of action.” Smith v. Lincoln Gen. Hosp., 27,133 (La.App. 2 Cir. 6/21/95), 658 So.2d 256, 262 (emphasis in original).
In the case' before us, as part of his instructions to the jury regarding informed consent, the trial judge indicated that the physician’s failure to inform his | mpatient of a risk that is medically known and of such magnitude that it would be material to the reasonable patient’s decision “may permit [the jury] to reach the conclusion that the physician was negligent.” This instruction made clear to the jury that they were permitted to find that defendants had breached the standard of care if they failed to obtain Mr. Deykin’s informed consent to the surgical procedure. We disagree with plaintiffs’ assertion that the jury was somehow prevented from making any determination on the issue of informed’ consent simply because a separate and distinct jury interrogatory on informed consent was not included on the verdict form. We find no abuse of discretion, in the trial judge’s decision, to not include a separate and distinct jury interrogatory on informed consent;- nor do we find it to be “plain and fundamental” error.

Informed Consent

Next,'we turn to the question of whether the jury erred in its verdict on the issue of informed consent.
A court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong. Davis v. Barre, 15-706 (La.App. 5 Cir. 5/12/16), 192 So.3d 280, 283 (citing Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La. 1993)). In order to reverse the factfinder’s determinations, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and that the record establishes that the finding is clearly wrong. Id. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). Where there are two permissible views of the : evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Davis, supra.
InThe law regarding informed consent in medical malpractice claims is well settled in Louisiana. Griffitt v. Binder, 12-744 (La.App. 5 Cir. 5/30/13), 119 So.3d 794, 797. A physician is required to provide his patient with sufficient information to allow the patient to make an informed and intelligent decision on whether to submit to the proposed course of treatment. Suarez v. Mando, 10-853 (La.App, 5 Cir. 3/29/10), 62 So.3d 131, 135. Louisiana’s Uniform Consent Law in effect at the time of Mr. Deykin’s meetings with his doctors and at the time of his surgery provided: “[in] a malpractice claim which is based on the failure of the physician or other health care provider to disclose or adequately disclose the risks and hazards.involved in the medical care or surgical procedure rendered by the physician or other health care provider, the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a rea *1243 sonable person in making a decision to give or withhold. consent.” La. R.S. 40:1299.40(E).
Plaintiffs allege that Mr. Deykin’s doctors failed to inform him of all of the material risks associated with the bilateral knee replacement surgery, particularly those risks of injury or death incident to his pre-existing health conditions. In support of their position that Mr. Deykin was not properly informed of the risks of the surgery, plaintiffs offered the testimony of Susan Deykin, Mr. Deykin’s daughter, who was present at the time of Mr. Deykin’s consultations with Dr. Chimento. Ms. Dey-kin testified that she was with Mr. Deykin at the time Dr. Chimento went over the consent forms, and the language in them, about the risks of surgery, anesthesia, and possible death, and that she and Mr. Dey-kin signed the consent forms. Ms. Deykin also discussed with Dr. Ghimento’s assistant the risks associated with drops in blood pressure during surgery. •
Dr. Chimento testified that he met with Mr. Deykin and Ms. Deykin on December 12 following the clearances by cardiology and the primary care 112physician. At that time, Dr. Chimento discussed the risks associated with the surgery, including the material risks of the treatment and procedure listed on the consent form signed by Mr. Deykin.
These consent'forms were also introduced into evidence. The “Patient Consent to Medical Treatment or Surgical Procedure” and “Acknowledgment of Receipt of Medical Information” clearly set forth the patient’s condition, the treatment, material risks of the treatment, alternative treatments, and the material risk of refusing any treatment. In' particular, the list of “Material Risks Associated with Treatment/Procedure” included: death; brain damage; paralysis from the neck down (quadriplegia); paralysis from the waist down (paraplegia); loss, or loss of function, of an arm or leg; disfigurement (including scars); injury to nerves; wound healing problems; limb length discrepancy; varying degrees of weakness, deformity, pain, paralysis, numbness, limitation of motion of the joints; infection; goals of procedure may not be obtained, and other therapy may be necessary; continuation or recurrence of condition or symptoms for which the procedure was performed which may require further therapy or surgery including removal of prosthesis, stiffness, swelling, pain, blood clots and emboli, implant failure, loosening, dislocation, loss of fixation, bleeding and hematoma, heterotopic ossification, and periprosthetic fracture. The form also contained a section disclosing the “Material Risks of Sedation” including: death; heart attack (cardiac arrest) or other heart problems; and, severe drop in blood pressure (shock) with vital organ damage. The' “Acknowledgment, Authorization, and Consent” page also states that the patient has had the opportunity to disclose to and discuss with the physician those risks of particular concern and that the patient has had the opportunity to ask, and has askefl, any questions about the information contained in the document or about the proposed procedure and that such questions were | iaanswered in .a satisfactory manner. Mr...Deykin, and a witness, signed this form on December 12, 2008. ■ . .
The “Patient Consent to Anesthesia and/or Acknowledgment of Receipt of Medical Information” includes reference to the “Surgical Consent” as well as a non-exhaustive list of “Material Risks of Treatment/Procedure,” which includes death, heart attack (cardiac arrest) or other heart problems, and severe drop in blood pressure (shock) with vital organ damage., Mr. Deykin, and a witness, also signed this form on December 12,2008.
*1244 The version of La. R.S. 40:1299.40(A)(1) in effect at the time that Mr. Deykin signed the consent forms provided:
(1) Notwithstanding any other law to the contrary, written consent to medical treatment means the voluntary permission of a patient, through signature, marking, or affirmative action through electronic means pursuant to R.S. 40:1299.40.1, to any medical or surgical procedure or course of procedures which sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is evidenced by a signature, marking, or affirmative action through electronic means, by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent, by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
The consent forms signed by Mr. Deykin and introduced into evidence conform to the statutory requirements articulated in this statute, and therefore establish a presumption that Mr. Deykin validly consented to the risks inherent in his surgery. From a review of the consent forms and the testimony of Ms. Deykin and Dr. Chimento, we find that a jury might reasonably conclude that Mr. Deykin gave his informed consent to the surgery and that such consent was not induced by |Many misrepresentation of material facts. Accordingly, we find no manifest error in the jury’s verdict on informed consent.
CONCLUSION
Having found no error in the trial court’s decision to not provide jury charges or interrogatories regarding loss of a chance of survival, or a separate jury interrogatory regarding informed consent, and finding no manifest error in the jury’s verdict as it relates to the issue of informed consent, we affirm the judgment of the trial court.
AFFIRMED

. Hespan is a synthetic plasma expander used to expand blood plasma volume.

. Pursuant to the Louisiana Medical Malpractice Act, the claim was first reviewed by a medical review panel, which rendered an opinion finding no malpractice on the part of defendants.

. In Smith v. Department, the patient's .preexisting condition was small cell carcinoma of the lungs, a fast-acting and lethal cancer that went undiagnosed and untreated by defendant for fifteen months, and from which the patient died four and one-half months after eventually being diagnosed by defendant. Smith v. Department, 676 So.2d at 545. In Hastings, .the pre-existing condition was two stab wounds in the parasternal area that caused the patient’s death by cardiac arrest within two hours of admittance to the erner-gency room. Hastings, 498 So.2d at 715. In Smith v. State, the pre-existing condition was *1241 cardiac arrest, which caused the patient's death within five hours of her arrival at the emergency room. Smith v. State, 523 So.2d at 816. In Martin, the pre-existing condition was myocarditis, an inflammation of the muscular wall of the heart, which caused the patient’s death by cardiac arrest. Martin, 582 So.2d at 1274. In Ambrose, the pre-existing condition was also cardiac arrest, which caused the patient’s death after defendant’s delay in transporting him to the hospital. Ambrose, 639 So.2d at 218.

. If the patient has a better-than-even chance of surviving the pre-existing condition at the time of the defendant's malpractice, and as a result of defendant’s malpractice he loses that chance, then the plaintiff’s claim is one for survival and wrongful death, not merely a claim for loss of a chance of survival with its concomitant lesser damages.

. ' Similarly, in Matranga, the plaintiffs did not specifically plead a cause of action for loss of a chance of survival in their petition for damages; however, in Matranga, we found that the plaintiffs did present evidence to the jury in support of a claim for loss of a chance of survival, and lodged a contemporaneous objection when the trial judge declined to give a jury instruction on that theory of recovery.