STEPHANIE A. VARNADO

VERSUS

PENNSYLVANIA MANUFACTURERS'
ASSOCIATION INSURANCE COMPANY

NO. 23-CA-528

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 820-903, DIVISION "M"
HONORABLE SHAYNA BEEVERS MORVANT, JUDGE PRESIDING


August 14, 2024


**STEPHEN J. WINDHORST**
**JUDGE**


Panel composed of Judges Fredericka Homberg Wicker,
Stephen J. Windhorst, and John J. Molaison, Jr.


**AFFIRMED**
    **SJW**
    **FHW**
    **JJM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLANT,
STEPHANIE A. VARNADO
    Joseph M. Bruno, Sr.
    Donald D. Reichert, Jr.
    Markita Hawkins

COUNSEL FOR DEFENDANT/APPELLEE,
PENNSYLVANIA MANUFACTURERS' ASSOCIATION INSURANCE
COMPANY
    John Parker
    Amy G. Lowe

**WINDHORST, J.**

In this personal injury lawsuit, plaintiff/appellant, Stephanie Varnado, appeals the trial court's January 31, 2023 judgment, rendered in accordance with the jury verdict, awarding her $535,256.74 in total damages and allocating 50% of fault to her for failing to mitigate her lost wages damages. Plaintiff also appeals the trial court judgment granting defendant/appellee, Pennsylvania Manufacturer's Association Insurance Company, an offset and credit against the jury award in the amount of $236,646.52 representing the combined total amount of medical and wage/indemnity benefits her workers' compensation insurer paid to her. We affirm these judgments.

**BACKGROUND and PROCEDURAL HISTORY**

On October 16, 2019, Ms. Varnado suffered multiple injuries in an automobile accident, in which Irma Estrada rear-ended Ms. Varnado. Ms. Varnado was in the course and scope of her employment with ForTec Medical, Inc. at the time of the accident. Ms. Varnado settled her claim with the tortfeasor, Ms. Estrada, and her insurer for $15,000.00, the underinsured tortfeasor's liability policy limits. Ms. Varnado also settled her workers' compensation claim with ForTec's workers' compensation insurer for $236,646.52, including $140,734.52 in medical benefits ($50,000.00 in future medical benefits) and $95,912.00 in indemnity benefits ($45,000.00 in future indemnity benefits).

On September 18, 2021, Ms. Varnado filed suit against Pennsylvania Manufacturer's Association Insurance Company ("PMA"), seeking coverage under the uninsured and/or underinsured ("UM") provisions of the commercial auto liability policy issued to ForTec, her employer, at the time accident. Ms. Varnado asserted that her claim exceeded the tortfeasor's policy limits, and she sought recovery of the excess amount from PMA. PMA answered the petition, asserting it had tendered UM payments to Ms. Varnado in full satisfaction of her damages

arising from the 2019 accident. PMA also asserted that it was entitled to an offset and credit for any benefits Ms. Varnado received from the workers' compensation insurer and any payments she received from the underinsured tortfeasor's insurer.

Before trial, PMA filed a motion for offset and credit against any jury award in favor of Ms. Varnado, seeking a credit for the $15,000.00 received from Ms. Estrada's insurer and the $236,646.52 Ms. Varnado was paid in workers' compensation benefits. PMA stated it had tendered two unconditional payments totaling $115,000.00 to Ms. Varnado. PMA asserted that because Ms. Varnado had received $366,646.52 in payments for which PMA was entitled to an offset and credit, PMA should only be responsible for a jury award exceeding $366,646.52 to the extent of PMA's remaining $885,000 policy limit. Ms. Varnado opposed the motion, arguing that PMA could not meet its burden of proving that PMA and the workers' compensation insurer are solidary obligors, as required to establish entitlement to an offset and credit.

By judgment dated November 17, 2022, the trial court granted PMA's motion for offset and credit, in part, ruling that PMA (1) had no obligation to pay the first $15,000.00 of Ms. Varnado's damages because this amount represented the underinsured underlying liability policy limits applicable to this case; and (2) was entitled to an offset and credit against any damage award to plaintiff for the amounts PMA already tendered to Ms. Varnado, which totaled $115,000.00. The trial court, however, found it was premature to consider the issue of offset and credit relative to the amounts Ms. Varnado received from the workers' compensation insurer.

The parties proceeded to a jury trial from December 12 to 15, 2022. After trial, the jury rendered a verdict in favor of Ms. Varnado, awarding the following damages: (1) $95,440.11 in past medical expenses; (2) $100,000.00 in future medical expenses; (3) $122,833.26 in past lost wages; (4) $62,400.00 in future lost wages; (5) $66,000.00 in past physical pain, suffering mental anguish, and emotional

distress; (6) $100,000.00 in permanent physical impairment; and (7) $50,000.00 in past impairment of enjoyment of life. The jury found Ms. Varnado failed to mitigate her past lost wages and allocated 50% of the fault to her, thereby reducing her past lost wages award to $61,416.63.

After trial, by judgment dated May 16, 2023, the trial court reconsidered PMA's motion for offset and credit based on the jury award and granted an additional offset and credit as follows: (1) $112,850.52 for medical expenses; (2) $112,000.00 future medical expenses; and (3) $61,416.63 for past lost wages.

Ms. Varnado has appealed the judgment on the jury verdict and the trial court's judgment granting the offset and credit.

**TRIAL EVIDENCE**

Before trial, the parties stipulated that Ms. Estrada was 100 percent at fault for the 2019 accident, and that PMA was entitled to an offset and credit against any money judgment awarded to Ms. Varnado for the $15,000.00 she received from Ms. Estrada's insurer and the $115,000.00 PMA had already unconditionally tendered to her. The trial focused on the extent of Ms. Varnado's damages in order to determine the amount of PMA's liability under the UM coverage it issued to ForTec.

At trial, Ms. Varnado relied on testimony from: (1) herself; (2) Dr. Samer Shamieh, Ms. Varnado's surgeon; (3) Dr. Chad Domangue, her treating physician; and (4) Elizabeth Martina, Ms. Varnado's vocational rehabilitation counselor and life care planner. PMA presented testimony from Dr. Najeeb Thomas as its expert medical witness, and Stacie Nunez as PMA's vocational rehabilitation counselor and life care planner.

Ms. Varnado testified about her extensive work history, revealing a broad range of employment, from Coast Guard service to office management, administrative work, and surgical technician. In the Coast Guard, she completed

four years of active duty working as a diesel mechanic and assisting in search and rescue and drug enforcement.

Ms. Varnado began her employment with ForTec, a surgical equipment vendor, as a surgical technician in October 2011. As a technician, she worked in a multi-state region, including Tennessee, Mississippi, Alabama and Florida, and consequently, often drove up to six hours a day. At the time of the accident, she was earning $67,644.58 per year with ForTec.

Ms. Varnado testified that the initial impact from the 2019 accident was significant and caused an instant heat radiation feeling in her back. Immediately following the accident, she requested that someone come and relieve her from assisting in a surgery. Once someone arrived, Ms. Varnado left work and went to Redi-Med Clinic. After the 2019 accident, ForTec put her on office duty, and she assisted with scheduling until November 25, 2019, after which she did not work at all. She was still not working at the time of trial.

Ms. Varnado testified regarding several pre-existing conditions from which she suffered before the 2019 accident. In 2016, she suffered from severe neck pain, lower back pain, and numbness in her right arm. Due to the severity of her pain, Ms. Varnado underwent a fusion surgery by Dr. Shamieh in February 2016.[1] After this surgery, she continued to have back pain and in December 2016, she was diagnosed with moderate to severe chronic back pain. In May 2017, she had bilateral rhizotomy[2] procedures to relieve the pain. At trial, she claimed the surgery and the 2017 rhizotomies relieved all her symptoms.

Ms. Varnado contended that before the 2019 accident occurred, she had been pain free and had not seen Dr. Shamieh since 2016 and Dr. Domangue since 2017.

---

[1] In a two-level fusion, the surgeon removes a disc and replaces it with small metal pieces and screws. These fuse together, preventing the joint from flexing or bending and causing pain.

[2] A rhizotomy eliminates pain in an area because it burns the nerves and numbs the area. It does not resolve the problem causing the pain.

She testified that the thoracic rhizotomy she had in 2017 relieved her pain for a long time.

Ms. Varnado acknowledged she was also involved in multiple accidents and had an extensive history of neck and back pain before the 2019 accident. She specifically acknowledged that she was involved in another car accident in October 2018, for which she sought treatment at Redi-Med and reported neck and mid to upper back pain. She received a round of pain medication after this accident, but no other treatment was discussed at trial.

For the injuries caused by the 2019 accident, Ms. Varnado first sought treatment from Dr. Shamieh, because he had performed the fusion surgery on her. She testified that the 2019 accident caused her to have neck and back pain in the middle of her shoulder blades and below her ribs. Although Dr. Shamieh was familiar with her physical condition both before and after the accident, he referred her to Dr. Domangue because Dr. Shamieh's practice focused on surgery. Dr. Domangue's practice focused on pain management.

Soon after the 2019 accident, in November 2019, Ms. Varnado had an MRI, which revealed herniations at the C3-C4 and C4-C5, as well as a 40 percent compression on her spinal cord at T9-T10. She stated that the compression on her spinal cord had increased from 15 percent to 40 percent after the accident.

Ms. Varnado testified that she had new pain in her cervical spine (neck region) above the area of her previous fusion surgery and an exacerbation of thoracic spine (spine's mid-section) pain. She tried physical therapy, medical branch blocks, and epidural injections, but these did not resolve her pain. She eventually underwent a rhizotomy in her cervical area, C3 to C5, which provided some relief.

Ms. Varnado testified she enjoyed working, learning new things, and often arrived at work early before the accident. She rarely missed work except for six to eight weeks in 2016 when she was recovering from her surgery. However, since the

2019 accident, she has been unable to work and has become a hermit because she's embarrassed that she cannot work. She indicated that, since the 2019 accident, her relationship with her ex-fiancé ended, and she has become dependent on her two sons. She stated that she used to be very active and enjoyed many outdoor activities, such as hunting, fishing and kayaking, but she can no longer enjoy these activities. She testified that she suffers from serious balance issues now and falls down often.

As to the independent examination by PMA's expert, Dr. Thomas, she explained that he examined her once "for a few minutes." During the examination, Dr. Thomas had her perform some physical tasks, including squeezing his fingers and pushing/pulling her arms. She testified Dr. Thomas asked her "minimal questions" in performing his evaluation.

Ms. Varnado further testified that she has discussed with her doctors her potential need for surgery in the future. She testified that she would like to avoid surgery for as long as possible because it is a very complicated surgery.

### Ms. Varnado's Experts

Dr. Shamieh, who was accepted as an expert in the field of orthopedic surgery, began treating Ms. Varnado as far back as April of 2012. At that time, she had minimal degenerative disc disease at L3-L4, and he treated her for low back and leg pain. She received an epidural steroid injection and her low back pain reduced.

In February 2014, Dr. Shamieh treated Ms. Varnado for cervical (neck), upper back, and right arm pain. Dr. Shamieh testified the cervical area and thoracic area (middle back) are completely different sections of the spine and the pain in one area is generally not caused by an issue in the other area. In 2014, Ms. Varnado had a foraminotomy or a decompression, in which a small incision was made in the back of her neck, and the area around the nerve that goes down the arm was cleaned. This procedure relieved the pressure on the nerve and provided relief to that area.

Ms. Varnado, however, suffered another neck injury in a car accident in 2014, which continued to cause her severe pain for years. Eventually, in February 2016, Dr. Shamieh performed a fusion on her neck at C5, C6, and C7. In performing the fusion, Dr. Shamieh made an incision on the front of her neck, and removed the two discs causing her pain to relieve the pressure off of her nerves and her spinal cord. Dr. Shamieh then replaced those discs with a plastic cage to allow those bones to fuse together, which prevents the bones from moving and causing pain. Dr. Shamieh indicated that after these procedures, Ms. Varnado's vertebrae would have been more susceptible to injury above and below where the procedures were performed. By August 2016, Dr. Shamieh had released Ms. Varnado back to work with no restrictions, and she had reported 100% relief to her neck pain.

Dr. Shamieh testified that the area injured in the 2019 accident was normal before that accident. He indicated that a MRI taken between her surgery and the 2019 accident showed that the C4-C5 discs were normal. After the 2019 accident, Ms. Varnado had a fairly large disc herniation at C4-C5. As a result, he opined that it is fairly obvious or more likely than not the 2019 accident caused this disc herniation.

Dr. Shamieh recognized that the C4-C5 disc injured in the 2019 accident is directly adjacent to the area where he had performed the 2016 fusion surgery, and that the fusion surgery can cause adjacent discs to degenerate more quickly than normal.

Dr. Shamieh testified that, in July 2021, he released Ms. Varnado to return to work because he did not think she was in danger of hurting herself and she told him that she wanted to go back to work to "earn a living." She, however, returned a few months later and told him that she tried to return to work, but was unable to do her job. As a result, Dr. Shamieh restricted her from working again. In his opinion, Ms. Varnado wants to work and not being able to work has made her life difficult.

With regard to future treatment, Dr. Shamieh testified that she will definitely require future medical care and will more probably than not need a surgery to repair the damaged disc. He testified that because of the 2019 accident, she will likely need to see her primary care doctor or a pain management doctor more often than him, because he focuses on surgical patients. He testified she will also require three MRIs, three CT scans of her neck, approximately ten x-rays, and about 200 physical therapy visits. Dr. Shamieh acknowledged that regardless of the 2019 accident, he thought Ms. Varnado would likely require a surgery at the C4-C5 area at some point in her life.

Dr. Chad Domangue testified on behalf of Ms. Varnado as an expert in the fields of neurology and pain management. Ms. Varnado first saw Dr. Domangue in 2014 for pain management related to her neck and arm. At trial, Dr. Domangue confirmed that, before the 2019 accident, Ms. Varnado had pre-existing degenerative changes in her spine, chronic mid-upper back pain, and suffered from falls, which can exacerbate neck and back problems. He also acknowledged that her prior neck surgery is causing deterioration of two to three percent per year to the adjoining disc and is a huge factor for her symptomology. Dr. Domangue further confirmed he treated Ms. Varnado for injuries related to at least two car accidents before the 2019 accident.

He testified that he did not see Ms. Varnado from 2017 until after the 2019 accident. Dr. Domangue indicated that by 2017 and for two and one-half years thereafter, Ms. Varnado was functioning well, working, and did not require his services. He opined that Ms. Varnado definitely would prefer to work, is extremely tough, and is not a malingerer. He stated that Ms. Varnado is a completely different person now than she was before the 2019 accident, including the fact that she could work before the 2019 accident, and that the 2019 accident exacerbated her pre-existing conditions.

Dr. Domangue testified he knows Ms. Varnado's history and spine extremely well as he has treated her for a number of years and given her many injections. He opined that after the 2019 accident, the MRI showed significant changes, including a herniated disc and a fourfold increase in compression on the spinal cord from .4 millimeters to .16 millimeters. He stated that the impingement on her spinal cord caused by the 2019 accident had affected her neurologic function, caused incoordination, which resulted in her falling, and greatly affected her ability to work. To treat these new injuries, he had given Ms. Varnado a thoracic epidural steroid shot and rhizotomies.

Dr. Domangue confirmed that he agreed with Dr. Shamieh's work restrictions imposed on Ms. Varnado after the 2019 accident. He testified he believed Ms. Varnado has been unable to work since the 2019 accident. He also stated he agreed with Star Therapy's functional capacity evaluation, finding that sedentary work would be tough for Ms. Varnado because sitting in a static position is "murder" on someone with a fusion.

Dr. Domangue testified that he had treated Ms. Varnado recently (in 2022) and had given her a thoracic epidural shot and a cervical rhizotomy for neck pain. He opined that this treatment was related to the 2019 accident because he had not treated her for two and one-half years before the 2019 accident, and then after a new trauma, her pain had returned.

For future treatment, Dr. Domangue agreed with Dr. Shamieh that Ms. Varnado would need approximately five more rhizotomies over the next five to ten years, as well as physical therapy, implantable devices, spinal cord stimulators, and/or pain pumps. He, however, acknowledged that she would likely have needed some of this medical treatment regardless of the 2019 accident because of her pre-existing conditions. He confirmed she will require another surgery because of the

2019 accident. Dr. Domangue opined that the 2019 accident accelerated her need for surgery by two to three years.

The third expert Ms. Varnado presented was an expert in the field of life care planning and evaluation, Elizabeth Martina. Ms. Martina opined that Ms. Varnado has demonstrated an exemplary work ethic, and that, in her opinion, she would go back to work if she could.

Ms. Martina testified that pre-accident, Ms. Varnado received an annual salary of $67,644.58, but post-accident, the most she could likely earn would be between $8.22 to $17.06 per hour in a light duty or sedentary job, which would be $17,097.60 to $35,484.80 annually.[3] If she demonstrated the ability to attain and maintain that type of employment, she could possibly earn more. Ms. Martina opined that Ms. Varnado suffered a significant wage loss due to the 2019 accident in that she was 51 years of age at the time of trial, and work expectancy is generally to the age of 65 or 67. Ms. Martina also testified the potential total cost of future medical expenses Ms. Varnado may incur would range from $351,511.61 up to $530,957.98 based on the recommendations of Dr. Shamieh and Dr. Domangue.

*PMA's Experts*

Dr. Najeeb Thomas, whose practice focuses on the treatment of spine-related pain and diseases, testified as an expert in neurosurgery for PMA. Dr. Thomas rendered opinions based on his physical examination of Ms. Varnado in June 2022 and the medical records PMA provided to him.

Dr. Thomas opined that degenerative changes are the most common cause of pain in the spine, and that Ms. Varnado appeared to have a degenerative condition because she developed pain and required fusion surgery at C6-C7 without any trauma. Dr. Thomas testified that the fusion Ms. Varnado had in 2016 created more

---

[3] To determine the amount Ms. Varnado could make at this wage per year, Ms. Martina multiplied the hourly wage by 2,080, the number of work hours in a year.

stress on the spine above and below the surgical area and advanced her degenerative conditions because the load on or motion of the spine is no longer shared by all the segments.

Dr. Thomas confirmed that Ms. Varnado's 2019 MRI of the cervical spine showed a new herniation at the C4-5 level, which was not present in her 2015 MRI. Dr. Thomas initially testified that he did not have an opinion as to whether the new herniation was caused by degenerative changes or trauma. On cross-examination, however, he stated that he could not rule out the 2019 accident as a cause of the herniated disc but he did not think the 2019 accident caused it. Dr. Thomas did agree that the 2019 accident exacerbated Ms. Varnado's preexisting conditions, but opined that she likely returned to her baseline three to six months after the accident, between January and March of 2020. Dr. Thomas testified Ms. Varnado could have returned to work a desk job, a sedentary position, with no physical exertion within three to six months of the accident.

With respect to Dr. Domangue's recent treatment of Ms. Varnado for neck pain, Dr. Thomas opined that this pain is in the facet joints in the neck and that these are likely degenerative in nature. He testified that a 2021 MRI again showed the herniation at C4-C5 and degenerative changes at C3-C4. However, Dr. Thomas testified that a 2022 MRI showed the herniation at C4-C5 had improved.

He further opined that he did not think Ms. Varnado would need any future treatment because of the 2019 accident. Instead, he found that future treatment would be necessary due to the progression of her degenerative changes. Dr. Thomas opined that Ms. Varnado does not need a fusion and that it would be difficult to relate a surgery to the 2019 accident because the herniated disc has improved and she was currently being treated for a different problem.

Finally, Stacie Nunez testified that she is a vocational rehabilitation counselor and life care planner for PMA, and she met with Ms. Varnado in May 2023. Ms.

Nunez testified that Ms. Varnado was capable of performing the duties of a regional logistics manager as that is sedentary work, but was not able to confirm whether this job would require lifting of anything heavier than 20 pounds. Ms. Nunez believed that Ms. Varnado had performed this job in 2016 after her cervical fusion surgery. Ms. Nunez opined that Ms. Varnado did not have any past lost wages claim.

She also opined based on her conversation with Dr. Thomas that Ms. Varnado was capable of returning to the same type of work she was performing before the accident, *i.e.*, the surgical technician job. In addition, considering it was Dr. Thomas' opinion that Ms. Varnado did not require future medical treatment, her life care plan (*i.e.*, future medical expenses related to the 2019 accident) for Ms. Varnado was zero.

Ms. Nunez testified that she conducted a labor market survey, during which she contacted employers in Ms. Varnado's area and explained her education, work history, and physical restrictions. Ms. Nunez discussed the median hourly wage from the Bureau of Labor Statistics, which she indicated was $23.43. Based on this survey, Ms. Nunez found that Ms. Varnado would not suffer any future wage loss due to the 2019 accident. She pointed out Ms. Varnado has (1) worked in office, clerical, secretarial type jobs, and managerial jobs; (2) adapted to different work environments and is very skilled; (3) received promotions throughout her work history. Considering these facts, Ms. Nunez stated that she found Ms. Martina grossly undervalued Ms. Varnado's future earning capacity.

**LAW and ANALYSIS**

On appeal, Ms. Varnado asserts (1) the trial court's jury instructions and jury verdict form constitute reversible error; (2) the jury's award of damages is manifestly erroneous; and (3) the trial court erred in granting PMA a dollar-for-dollar offset and credit against the jury verdict for the amounts ForTec's workers' compensation insurer paid to her.

*Jury Instructions and Verdict Form*

Ms. Varnado claims the jury was unable to properly consider and determine the extent of her past lost wages, because the trial court instructed the jury to determine the total amount of damages based on Ms. Varnado's duty to mitigate her damages and also to express a percentage of fault by which Ms. Varnado failed to mitigate her damages. Specifically, Ms. Varnado asserts the use of "this" in the "Damage Mitigation" instruction confused the jury because the jury did not know to what "this" referred and resulted in the jury reducing her past lost wages twice. The jury instruction at issue stated:

### DAMAGE MITIGATION

You are instructed that an accident victim has a duty to mitigate damages. Our law seeks to fully repair injuries which arise from a legal wrong, but an accident victim has a duty to exercise reasonable diligence and ordinary care to minimize her damages after the injury has been inflicted. She need not make extraordinary or impractical efforts, but she must undertake those which would be pursued by a woman of ordinary prudence under the circumstances.

You may do **this** by assigning a percentage of fault to the Plaintiff. You are free to assign whatever percentage you feel appropriate, if any, and you should do so by answering the question, which will be provided to you on a special verdict form.

It is the duty of the jury to determine the total dollar amount of damages the Plaintiff has sustained. Do not increase or decrease this amount based on the percentages you have determined. I will make the proper calculations after your return of the verdict.

Ms. Varnado further argues that the verdict form exacerbated the confusion, because the trial court not only instructed the jury to consider her duty to mitigate in awarding past lost wages but also required the jury to allocate a percentage of fault to her for failing to mitigate her past lost wages claim.

The verdict form on mitigation asked the following:

2. If you found above that Plaintiff, Stephanie Varnado, sustained damages in the form of past lost wages, do you further find that plaintiff failed to mitigate her damages with respect to past lost wages? YES _X_ NO ___

3. What percentage of fault do you attribute to Plaintiff, Stephanie Varnado, for failing to mitigate her damages in the form of lost wages? _50 %._

La. C.C.P. art. 1792 requires the trial court to instruct the jurors on the law applicable to the cause submitted to them. Trial courts are given broad discretion in formulating jury instructions and a trial court's judgment should not be reversed so long as the charge correctly states the substance of the law. Woods v. Winn-Dixie Montgomery, L.L.C., 17-707 (La. App. 5 Cir. 6/27/18), 251 So.3d 675, 680, writ denied, 18-1263 (La. 10/29/18), 255 So.3d 567. Adequate jury instructions are those which fairly and reasonably identify the issues and provide correct principles of law for the jury to apply to the issues. Landry v. Nat'l Union Fire Ins. Co. of Pittsburgh, 22-593 (La. App. 5 Cir. 12/13/23), 380 So.3d 61, 80, writ denied, 24-137 (La. 4/9/24), — So.3d —. The determinative question is whether the jury instructions misled the jury to the extent the jury was prevented from dispensing justice. Id.

"A trial court has discretion in determining the contents of a jury verdict form, thus, the standard of review is whether the trial court abused that discretion." Deykin v. Ochsner Clinic Found., 16-488 (La. App. 5 Cir. 4/26/17), 219 So.3d 1234, 1242. If the verdict form does not adequately set forth the issues to be decided by the jury (*i.e.* omits an essential legal principle or is misleading and confusing), the interrogatories may constitute reversible error. Murphy v. Jefferson Health Care Center, LLC, 09-304 (La. App. 5 Cir. 10/27/09), 27 So.3d 899, 903. Nevertheless, a jury verdict may not be set aside unless the verdict form is so inadequate that the jury is precluded from reaching a verdict based on correct law and facts. Danna v. Chestnut, 23-131 (La. App. 5 Cir. 11/29/23), 377 So.3d 439, 444. An appellate court should set aside a jury's findings and perform a *de novo* review of the record only when an appellate court finds a legal error in the instructions or verdict form prejudiced one of the parties. Id.

Upon review, we do not find the jury instructions and/or verdict form so confusing that the jury was incapable of reaching a verdict based on the correct law

and facts. The jury instructions clearly directed the jury to not increase or decrease the damage award based on the percentage of fault it determined for failure to mitigate damages. The instructions also clearly informed the jury the trial judge would make the proper calculations after the jury returned the verdict. Considering the use of "this" after the instruction on damage mitigation and in the sentence with "by assigning a percentage of fault to Plaintiff," a juror could have reasonably concluded that "this" refers to the jury's duty to determine whether Ms. Varnado mitigated her damages for lost wages.

Ms. Varnado also challenges the jury instruction for damages mitigation because it does not contain a statement concerning the burden of proof. We find the omission of this instruction does not rise to the level of preventing the jury from administering justice. Thus, even if this was error, the omission of a burden of proof instruction was harmless error. Adams v. Rhodia, Inc., 07-2110 (La. 5/21/08), 983 So.2d 798, 804.

As to the verdict form with respect to past lost wages, the form asked the jury to state (1) whether Ms. Varnado suffered damages, including but not limited to past lost wages; (2) whether plaintiff failed to mitigate her damages with respect to past lost wages; and (3) if so, what percentage of fault do you attribute to Ms. Varnado for failing to mitigate lost wages. Based on our reading of the verdict form, we find no indication that there was a "double reduction" of the past lost wages award.

Considering the foregoing, we cannot say the wording of the jury instructions or verdict form prejudiced Ms. Varnado or the trial court abused its discretion in formulating the jury instructions and/or verdict form.

Ms. Varnado also claims it was inappropriate to instruct the jury to assign a percentage of fault to her for failure to mitigate. Other cases, however, have assigned fault to plaintiffs for their failure to mitigate damages for past lost wages. Welch v. London, 20-0362 (La. App. 1 Cir. 12/30/20), 2020 WL 7768715 (appellate court

affirmed the jury's apportionment of 95% of fault to plaintiff for failing to adequately mitigate her damages for past lost wages); <u>Dettenhaim Farms, Inc. v. Greenpoint Ag, LLC</u>, 54,162 (La. App. 2 Cir. 11/17/21), 330 So.3d 743, 756 (appellate court found trial court was clearly wrong in not finding plaintiffs failed to mitigate their damages and reducing plaintiffs' damage award by 10% for their failure to mitigate). This claim therefore has no merit.

***Quantum***

Ms. Varnado challenges the jury's damage award for medical expenses, lost wages, and general damages. In awarding damages, the jury made factual findings and credibility determinations based on the evidence presented. Appellate courts may not disturb the factual findings of the trier of fact in the absence of manifest error. <u>Arceneaux v. Domingue</u>, 365 So.2d 1330, 1333 (La. 1979). We use a two part test for the appellate review of facts: (1) The appellate court must find from the record that there is a reasonable factual basis for the finding of the trier of fact, and (2) The appellate court must further determine that the record establishes that the finding is not clearly wrong (manifestly erroneous). <u>Mart v. Hill</u>, 505 So.2d 1120, 1127 (La. 1987). Where a conflict in the testimony exists, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed, even though the reviewing court may feel that its own evaluations and inferences are more reasonable. <u>Wilson v. Canal Ins. Co.</u>, 21-676 (La. App. 5 Cir. 11/23/22), 353 So.3d 969, 975. "As a general rule, the testimony of a treating physician should be accorded greater weight than that of a physician who examines a patient only once or twice. However, the treating physician's testimony is not irrefutable, and the trier of fact is required to weigh the testimony of all medical witnesses." <u>Rocha v. Ace Prop. & Cas. Ins. Co.</u>, 19-173 (La. App. 5 Cir. 12/18/19), 286 So.3d 1142, 1149. We consider Ms. Varnado's arguments relative to each element of damages below.

*Medical Expenses*

In a personal injury suit, the plaintiff bears the burden of proving a causal connection between the accident and the alleged injuries. Jackson v. Drachenburg, 19-345 (La. App. 5 Cir. 1/8/20), 288 So.3d 289, 293. Medical expenses are a component of special damages and generally may be determined with relative certainty. Romano v. Jefferson Par. Sheriff's Off., 13-803 (La. App. 5 Cir. 3/26/14), 138 So.3d 688, 694, writ denied, 14-700 (La. 5/16/14), 139 So.3d 1028. Credibility determinations, including evaluating expert witness testimony, are for the trier of fact. Detraz v. Lee, 05-1263 (La. 01/17/07), 950 So.2d 557, 564. While a gap in treatment does not necessitate a finding that the medical treatment is not related to an accident, a gap in treatment is a factor in determining whether medical treatment is related to an accident. Bush v. Mid-S. Baking Co. LLC, 15-540 (La. App. 5 Cir. 5/26/16), 194 So.3d 1170, 1177; Griffin v. Kurica, 03-190 (La. App. 5 Cir. 6/19/03), 850 So.2d 807.

The jury awarded Ms. Varnado $95,440.11 in past medical expenses.[4] The record indicates the jury awarded Ms. Varnado medical expenses through July 8, 2021. Ms. Varnado's medical records show that in March 2021, Ms. Varnado told Dr. Shamieh she had undergone injections with Dr. Domangue for her back pain and reported improvement for this pain. Based on the medical records from her July 2021 office visit with Dr. Shamieh, Ms. Varnado reported the severity of her pain as "1/10 at its most intense," and continued improvement in her low back and neck pain after the injections she had received.

In addition, Dr. Thomas opined that Ms. Varnado's injuries from the 2019 accident should have resolved within three to six months. While the jury did not agree Ms. Varnado's injuries had resolved in this short time period, the jury must

---

[4] Before trial, the parties stipulated that Ms. Varnado "claims" she has incurred $106,182.11 in medical expenses caused by the 2019 accident. PMA did not stipulate all these expenses were related to the 2019 accident.

weigh conflicting evidence. Thus, it was reasonable for the jury to conclude that as of July 2021, Ms. Varnado's injuries from the 2019 accident had resolved.

Further, considering Ms. Varnado's extensive pre-existing injuries, the jury could have reasonably concluded her medical treatment between July 2021 and trial was related to her fusion surgery, her reported falls, or other pre-existing injuries.

Ms. Varnado claims the award of future medical expenses is inconsistent with its decision to not award past medical expenses through trial. Entitlement to future medical expenses requires proof by a preponderance of the evidence the future medical expense will be medically necessary. Menard v. Lafayette Ins. Co., 09-1869 (La. 3/16/10), 31 So.3d 996, 1006. However, an award for future medical expenses is often highly speculative, not susceptible to calculation with mathematical certainty, and generally turns on questions of credibility and inferences. Id. Both Dr. Shamieh and Dr. Domangue consistently indicated in Ms. Varnado's medical records and in their testimony that in the future Ms. Varnado would require conservative treatment for injuries related to the 2019 accident and may be a surgical candidate if conservative treatment fails.

Considering her pre-existing conditions and these medical opinions, we do not find it was manifestly erroneous for the jury to decline to award past medical expenses through trial, and award an amount towards future medical expenses, which is generally "highly speculative." The jury could have reasonably concluded that Ms. Varnado's injuries from the 2019 accident had resolved by July 2021, but that in the future she may incur *some* medical expenses related to the 2019 accident.

Accordingly, we do not find the jury's award of past and future medical expenses manifestly erroneous.

### Lost Wages

Ms. Varnado asserts the jury's lost wages award is manifestly erroneous because the jury (1) had failed to award the full amount ($206,859.00) of her past

lost wages through trial; (2) found she failed to mitigate her lost wages; and (3) awarded an insufficient amount of future lost wages. Ms. Varnado asserts the medical evidence, particularly Dr. Shamieh and Dr. Domangue's opinions, showed she was unable to return to work.

A plaintiff seeking damages for lost wages bears the burden of proving lost earnings, as well as the duration of time missed from work due to the accident. Hunter v. Terrebone, 18-134 (La. App. 5 Cir. 12/27/18), 263 So.3d 993, 999, writ denied, 19-144 (La. 3/18/19), 267 So.3d 90. To obtain an award for future lost wages or earning capacity, a plaintiff must present medical evidence indicating with reasonable certainty that there exists a residual disability causally related to the accident. Id. In situations involving multiple accidents, whether preceding or subsequent to the accident at issue, a tortfeasor is liable only for the direct and proximate results of his wrongful acts, including aggravation of any preexisting injuries. Simon v. Auto. Club Inter-Ins. Exch., 20-156 (La. App. 5 Cir. 10/13/21), 329 So.3d 1072, 1087-88; Giavotella v. Mitchell, 19-100 (La. App. 1 Cir. 10/24/19), 289 So.3d 1058, 1077, writ denied, 19-1855 (La. 1/22/20), 291 So.3d 1044. Although a tortfeasor takes his victim as he finds him, the tortfeasor cannot be held liable for damages which are not attributable to the wrongful act. Id.

The primary issue here relative to whether the jury was manifestly erroneous in its award for past and future lost wages is causation; that is, whether, but for the 2019 accident, Ms. Varnado would have been able to earn wages and would continue to be able to earn wages. By awarding past medical expenses and past lost wages through summer 2021, it is undeniable that the jury found the 2019 accident caused Ms. Varnado injuries that prevented her from working for a period of time. Our analysis of causation for all Ms. Varnado's claimed past and future lost wages is complicated by her pre-existing health issues, including her 2016 two-level cervical fusion, and the effect this condition had on her ability to work.

Ms. Varnado asserts the jury reduced her claimed past lost wages from the outset in that the parties stipulated her past lost wages would compute to $206,859.00, and the jury awarded her $122,833.26 in past lost wages. We point out, however, the parties stipulated, "[t]here were 159 weeks from her last day of work to the date of trial, which computes to $206,859.00." The parties did not stipulate the 2019 accident caused Ms. Varnado's inability to work for this period of 159 weeks. Indeed, in the joint pre-trial order, PMA stated it disagreed Ms. Varnado was entitled to the full claimed amount of medical expenses and lost wages. PMA reserved its right to present the jury with different calculations regarding what past medical expenses and lost wages were related to the 2019 accident.

At trial, PMA argued, based on Ms. Varnado's medical history, that the 2019 accident only temporarily exacerbated Ms. Varnado's pre-existing conditions, including but not limited to her prior two-level cervical fusion surgery and bilateral rhizotomies in her thoracic spine. PMA asserted that she returned to her baseline condition within three to six months of the accident based on Dr. Thomas' testimony.

Although the jury did not agree Ms. Varnado's injuries resolved this quickly, the jury verdict indicates the jury found Ms. Varnado could have performed some sedentary work after the 2019 accident as they found she failed to mitigate her lost wages damages. Further, considering the jury awarded medical expenses through July 2021 and lost wages through August 2021, the jury obviously concluded her injuries resolved in the summer 2021. Specifically, the amount of lost wages awarded coincides closely around the time Dr. Shamieh cleared Ms. Varnado to return to work without any restrictions at her request. The jury awarded her $122,833.26 in past lost wages, which calculates to lost wages from October 16, 2019 through August 8, 2021, one month after Dr. Shamieh cleared her to work.

Given the jury had to weigh conflicting evidence, it was reasonable for the jury to reach this conclusion. After undergoing a thoracic rhizotomy in February

2021, Ms. Varnado went without seeing Dr. Domangue from March 2021 until October 2021. In addition, in March 2021, she reported 90% pain relief to Dr. Domangue. In March 2021, she also informed Dr. Shamieh she had improved, and in July 2021, she informed him she was ready to return to work. Further, Dr. Thomas opined Ms. Varnado was capable of performing *at least* desk-job type duties within three to six months after the accident.

Considering the foregoing, we cannot find the jury's award of lost wages for almost two years after the accident, but not through trial, manifestly erroneous.

Ms. Varnado also asserts the jury's assignment of 50% of fault to her for failing to mitigate her lost wages is manifestly erroneous.

In this regard, we point out that Dr. Thomas opined she was capable of performing *at least* desk-job type duties within three to six months after the accident. In addition, Ms. Nunez, PMA's vocational expert, testified regarding various types of sedentary jobs available for Ms. Varnado after the accident. Ms. Nunez referred to Ms. Varnado's extensive and varied work history in her reasoning that she could have returned to some sort of work between the 2019 accident and trial.

Ms. Nunez also pointed out that after Ms. Varnado's 2016 fusion surgery, a very serious procedure, ForTec accommodated Ms. Varnado's condition and allowed her to work in a position suitable for her condition. Specifically, after the 2019 accident, from October 2019 to November 25, 2019, ForTec placed her in a sedentary position assisting with scheduling and manager-type tasks. In November 2019, however, she was placed on "no work" status, and never attempted to return to work thereafter. Ms. Varnado did not ask ForTec to return to a sedentary job after being placed on no work status.

Based on the record before us, we cannot say the jury was manifestly erroneous in assigning 50% of fault to Ms. Varnado for failing to mitigate her lost wages damages.

*General Damages*

Ms. Varnado claims the jury's failure to award her damages for future physical pain, suffering, mental anguish, and emotional distress and future impairment of the enjoyment of life is inconsistent with the jury's award of future medical expenses, future lost wages, and permanent impairment. The jury awarded Ms. Varnado $216,000.00 in general damages, including $66,000.00 for past physical pain, suffering, mental anguish, and emotional distress; $100,000.00 for permanent physical impairment; and $50,000.00 for past loss of enjoyment of life.

Our jurisprudence has consistently held that in the calculation of general damages, considerable discretion is left to the jury. Antill v. State Farm Mut. Ins. Co., 20-131 (La. App. 5 Cir. 12/2/20), 308 So.3d 388, 405. The discretion vested in the jury is great, even "vast," so that an appellate court should rarely disturb an award of general damages. Id. Upon appellate review, general damage awards will be disturbed only where there has been a clear abuse of that discretion. Thibodeaux v. Donnell, 16-570 (La. 1/20/17), 219 So.3d 274, 278; Coco v. Winston Indus. Inc., 341 So.2d 332, 335 (La. 1976). In reviewing a general damage award, Louisiana appellate courts do not consider what they think is an appropriate award, but instead we review the exercise of discretion by the trier of fact. Joseph v. Netherlands Ins. Co., 15-549 (La. App. 5 Cir. 2/24/16), 187 So.3d 517, 519.

It is apparent from the evidence and trial testimony in the record that the jury simply did not believe Ms. Varnado's injuries caused by the 2019 accident were as significant as she claimed. The jury did not award past lost wages or medical expenses through trial. The evidence of Ms. Varnado's pre-existing conditions was extensive. There were conflicting expert opinions regarding the seriousness of Ms. Varnado's injuries. As a result, the jury was presented with substantial evidence upon which it could reasonably conclude only a limited amount of her pain and

suffering, mental anguish, emotional distress, and loss of enjoyment of life was related to the 2019 accident.

In addition, damages for permanent physical impairment are considered a form of general damages. Poche v. Allstate Ins. Co., 04-1058 (La. App. 5 Cir. 3/1/05), 900 So.2d 55, 62-63. Thus, contrary to Ms. Varnado's assertion, the jury did award her general damages for future suffering. After evaluating the evidence, including the credibility of the fact and expert witnesses who testified, and resolving the conflicting evidence regarding the pain and suffering experienced by Ms. Varnado, the jury had the prerogative to accept or reject, in whole or in part, any of the evidence it heard, and to assess general damages accordingly. Granger v. United Home Health Care, 13-910 (La. App. 1 Cir. 6/19/14), 145 So.3d 1071, 1091, writ denied, 14-1665 (La. 10/31/14), 152 So.3d 158

Accordingly, considering it is the jury's function to evaluate credibility and assess damages, we are unable to find the jury abused its vast discretion in its general damage award to Ms. Varnado.

### *The Offset and Credit*

Ms. Varnado claims the trial court erred in granting PMA a dollar-for-dollar offset and credit against the jury's verdict for the workers' compensation payments because PMA failed to satisfy its burden of proving solidary liability with ForTec's workers' compensation insurer.

The Louisiana Supreme Court addressed the issue of offset and credit between a workers' compensation insurer and an employer's UM insurer in Bellard v. American Central Ins. Co., 07-1335 (La. 4/18/08), 980 So.2d 654. The supreme court held that an employer's UM carrier is entitled to a credit for medical and disability wage benefits paid on behalf of or to the plaintiff by the workers' compensation insurer. Id. at 667. In its reasoning, the supreme court relied on the principles of solidary liability in that the two insurers had coextensive obligations to

reimburse the plaintiff for lost wages and medical expenses incurred as a result of his injury, as well as on the inapplicability of the collateral source doctrine. Id.

To determine whether a solidary obligation existed between the workers' compensation insurer and the UM carrier, the court applied a three-part test: (1) are they obliged to the same thing, (2) so that each may be compelled for the whole, and (3) does payment by one exonerate the other from liability toward the creditor. Bellard, 980 So.2d at 663-64.

Applying Bellard's three-part test reveals that PMA, the UM carrier, and ForTec's workers' compensation insurer are solidary obligors vis-à-vis Ms. Varnado. The first component of solidarity is met in that both the UM carrier and the workers' compensation insurer are "obliged to the same thing." They share coextensive obligations to reimburse Ms. Varnado for lost wages and medical expenses incurred due to her injuries caused by the 2019 accident. The second component of solidarity is also present because both the UM carrier and the workers' compensation insurer may be compelled for the whole of their common liability. Finally, the third component of solidarity is satisfied in this case. Payment by one of these insurers exonerates the obligation of the other insurer to Ms. Varnado. See also, Cutsinger v. Redfern, 08-2607 (La. 5/22/09), 12 So.3d 945.

In reaching its conclusion, the supreme court indicated the injured employee is not allowed to obtain double recovery on those elements of damage which are coextensive. Bellard, 980 So.2d at 666. Therefore, to the extent to which the UM carrier and the workers' compensation insurer are solidarily obliged, *i.e.,* the payment of lost wages and medical expenses, payment of the debt by one exonerates the other from liability to Ms. Varnado. Id.

The record establishes that the lost wages and medical expenses sought in this case are the same as those for which Ms. Varnado received $95,912.00 in wage/indemnity benefits and $140,734.52 in medical benefits for a combined total

of $236,646.52 in workers' compensation benefits. In the Joint Pre-Trial Order, the parties stipulated Ms. Varnado received these workers' compensation benefits. She specifically admitted in pleadings to the trial court that she asserted a workers' compensation claim for the October 16, 2019 accident and received $140,734.52 in medicals and $95,912.00 in indemnity benefits, totaling $236,646.52 in workers' compensation benefits for this accident. Ms. Varnado's workers' compensation claim file reflects coverage of the exact same treatment presented to the jury in this case. In addition, the Joint Petition for Approval of Worker's Compensation Compromise Settlement entered into between Ms. Varnado and the workers' compensation insurer specifically references the underlying 2019 accident.

Considering the foregoing, we find the record indicates PMA and the workers' compensation carrier are solidary obligors. We therefore find no error in the trial court's ruling that PMA is entitled to an offset and credit for the workers' compensation benefits paid to Ms. Varnado relative to the 2019 accident.

Alternatively, Ms. Varnado asserts that the offset and credit should be pigeon-holed between past and future damages for both lost wages and medical expenses. Ms. Varnado, however, does not cite any law that supports this position. Although she cites to Bellard, in which plaintiff recovered for past and future loss of earning capacity, the court did not distinguish any offset or credit between past and future damages.

Furthermore, La. R.S. 23:1103 B states:

> The claim of the employer shall be satisfied in the manner described above from the first dollar of the judgment without regard to how the damages have been itemized or classified by the judge or jury. Such first dollar satisfaction shall be paid from the entire judgment, regardless of whether the judgment includes compensation for losses other than medical expenses and lost wages.

In interpreting La. R.S. 23:1103 B, the Louisiana Supreme Court held that the language clearly evidences the legislative intent to require that employers and their insurers receive a credit for the entire amount of any compromise or settlement, or

23-CA-528                                          25

for the entire amount of a judgment, no matter how the damages have been itemized or classified. City of DeQuincy v. Henry, 10-0070 (La. 3/15/11), 62 So.3d 43, 51. The Louisiana First Circuit Court of Appeal interpreted it the same way, finding that regardless of whether the judgment includes awards for damages other than medical expenses and lost wages, the employer's claim takes precedence over that of the employee, such that the employer is entitled to receive credit from the first dollar of the judgment *no matter how the damages are classified in the judgment*. St. Tammany Par. Sch. Bd. v. Bullinger, 14-940 (La. App. 1 Cir. 12/23/14), 168 So.3d 493, 499. See also, Latiolais v. Bellsouth Telecommunications, Inc., 11-383 (La. App. 3 Cir. 10/5/11), 74 So.3d 872.

While we recognize the logic in Ms. Varnado's argument to apply the offset and credit separately, her argument clearly contradicts the language of La. R.S. 23:1103 B. Accordingly, we cannot find the offset and credit should differentiate between past and future awards of lost wages and medical expenses.

Considering the foregoing, we find no basis to disturb the trial court's judgment as written applying an offset and credit in favor of PMA relative to the workers' compensation insurer's payment of lost wages and medical expenses to Ms. Varnado.

**DECREE**

For the reasons stated above, we affirm the jury verdict as set forth in the trial court's January 31, 2023 judgment, and the trial court's May 16, 2023 judgment, granting PMA an offset and credit against the jury award in the amount of $236,646.52, representing the total amount of the workers' compensation insurer's payment of lost wages and medical expenses to Ms. Varnado.

<b><u>AFFIRMED</u></b>

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **AUGUST 14, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 23-CA-528

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE SHAYNA BEEVERS MORVANT (DISTRICT JUDGE)
JOSEPH M. BRUNO, SR. (APPELLANT)     JOHN PARKER (APPELLEE)

**MAILED**
DONALD D. REICHERT, JR. (APPELLANT)     AMY G. LOWE (APPELLEE)
MARKITA HAWKINS (APPELLANT)     TAYLOR DUNNE (APPELLEE)
ATTORNEYS AT LAW     ATTORNEY AT LAW
855 BARONNE STREET     POST OFFICE BOX 2471
NEW ORLEANS, LA 70113     BATON ROUGE, LA 70821