STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

24-195

ROXINE LACHNEY

VERSUS

JAMES L. GATES, M.D., ET AL

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, 259,930, DIVISION "B"
HONORABLE LOWELL C. HAZEL, DISTRICT JUDGE

**********

LEDRICKA J. THIERRY
JUDGE

**********

Court composed of Gary J. Ortego, Ledricka J. Thierry, and Wilbur L. Stiles, Judges.

AFFIRMED.

**Brian M. Caubarreaux**
**Eugene A. Ledet, Jr.**
**Jacob R. Caubarreaux**
**Charles A. Woessner**
**Brian Caubarreaux & Associates**
**2000 Kaliste Saloom Road, Suite 102**
**Lafayette, LA 70508**
**(337) 202-0900**
**COUNSEL FOR PLAINTIFF/APPELLANT**
    **Roxine Lachney**

**Randall M. Seeser**
**Daniel T. Marler**
**Gold, Weems, Bruser, Sues & Rundell**
**P.O. Box 6118**
**Alexandria, LA 71307**
**(318) 445-6471**
**COUNSEL FOR DEFENDANT/APPELLEE**
    **James L. Gates, M.D.**

**THIERRY, Judge.**

This action stems from a medical malpractice lawsuit that was dismissed after a bench trial on the merits. Plaintiff, who underwent three surgeries performed by Defendant, resulting in the removal of her uterus, right ovary, and left ovary, appeals the trial court's judgment. For the reasons that follow, we affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

Prior to the events leading to this malpractice lawsuit, Plaintiff, Roxine Lachney ("Ms. Lachney"), suffered from various women's health issues for years. From 2009 through 2012, Ms. Lachney treated with various doctors for symptoms and diagnoses ranging from lower abdominal pain, interstitial cystitis, frequent urination, excessive bleeding, and chronic pelvic pain. In November of 2012, after trying Depo-Provera and oral contraception, Ms. Lachney presented with excessive bleeding to Dr. K. Rabie at the Rabie Clinic for Women, who concluded she had dysfunctional uterine bleeding.

On January 23, 2013, Ms. Lachney began treating with Defendant, Dr. James Gates, at the Alexandria Women's Center. She presented with complaints of menometrorrhagia (excessive uterine bleeding) and explained her history of bleeding and of taking birth control. Dr. Gates noted her history of interstitial cystitis and abnormal uterine bleeding. He assessed her and noted that her uterus was "boggy, tender retroflexed uterus consistent with adenomyosis."

The medical records state that Ms. Lachney, who had one child, did not want any more children and wanted "definitive" treatment, which according to Dr. Gates, was a hysterectomy. Dr. Gates claimed he counseled Ms. Lachney on alternative treatments, but says she rejected the alternative treatment options. However, Ms.

Lachney denied such discussion and testified Dr. Gates encouraged her to undergo the hysterectomy.

On February 4, 2013, Dr. Gates performed a vaginal hysterectomy on Ms. Lachney, who was twenty-nine years old at the time. Her uterus was removed and sent to pathology, the results of which indicated that Ms. Lachney did not have adenomyosis.

The hysterectomy did not resolve all of Ms. Lachney's symptoms. A few months later, Ms. Lachney returned to Dr. Gates complaining of abdominal and pelvic pain. She was treated with medication in the months following, until November 25, 2013, when Dr. Gates performed a diagnostic laparoscopic surgery and removed adhesions and her right ovary (in a procedure known as a right salpingo oophorectomy). Similar to the hysterectomy, Dr. Gates and Ms. Lachney's version of events leading to the right oophorectomy differ.

Ms. Lachney continued to have symptoms in the months following the right oophorectomy. In May of 2014, Ms. Lachney returned to Dr. Gates, complaining of chronic pain and requesting definitive treatment. Dr. Gates performed a left oophorectomy (removal of the left ovary) on June 6, 2014. The pathology report revealed that the left ovary had a benign follicular cyst.

Unfortunately, Ms. Lachney suffered serious complications following the left oophorectomy. She became feverish after surgery and feces leaked from her vagina. On June 9, 2014, Dr. Gates and a general surgeon performed surgery on her again and found a pelvic abscess with a fistula. She continued having health complications from the left oophorectomy and began treating with a different doctor, who performed another surgery on her in January of 2015 to repair the fistula.

On April 29, 2015, Ms. Lachney filed a medical malpractice claim against Defendant, Dr. Gates, asserting that he breached the standard of care in performing three surgeries on her: the hysterectomy, the right oophorectomy and the left oophorectomy. The medical review panel issued its opinion on July 21, 2017, and said, in part, that "in light of the sworn affidavit testimony submitted by the claimant, Roxine Lachney, there is a material issue of fact, not requiring expert opinion, which the panel cannot resolve without making a credibility determination, bearing on liability for consideration by the court." Following the medical review panel proceeding, Ms. Lachney filed a petition for damages.

After a two-day trial on the merits and post-trial briefing, the trial court found that Dr. Gates did not breach the standard of care in performing the three surgeries at issue on Ms. Lachney. Ms. Lachney now appeals.

**ASSIGNMENTS OF ERROR**

Ms. Lachney alleges the following assignment of error on appeal:

1. The trial court committed legal error by applying the locality standard in determining whether JAMES L. GATES, M.D. deviated from the standard of care as a specialist practicing in the field of obstetrician and gynecologist.

Ms. Lachney then lists several issues presented for review:

1. Considering Dr. Gates' suspicion of adenomyosis as the cause for his patient's abnormal uterine bleeding, was it a deviation from the standard of care in failing to order diagnostic imaging, or any minimal testing, before proceeding with a sterilizing total hysterectomy?

2. Did Dr. Gates deviate from the standard of care by failing to determine *the cause* of abnormal bleeding before resorting to an unnecessary and irreversible hysterectomy?

3. Did Dr. Gates deviate from the standard of care by failing to allow Ms. Lachney to wean off Depo-Provera to determine if the progestin was the cause of the abnormal uterine bleeding, prior to the irreversible hysterectomy?

3

4. Did Dr. Gates obtain valid informed consent from his patient before going forward with the right salpingo-oophorectomy on November 25, 2013?

5. Did Dr. Gates deviate from the standard of care by failing to perform a thorough workup and evaluation of other non-gynecological causes of pelvic pain before performing the right salpingo-oophorectomy on November 25, 2013?

6. Did Dr. Gates deviate from the standard of care by performing a left salpingo-oophorectomy on June 6, 2014 on a benign ovary?

Although incorrectly labeled as "issues presented for review" rather than "assignments of error," these issues were adjudicated in the trial court, thoroughly briefed by Appellant, and alleged to be errors on the part of the trial court. Therefore, we will address them. *See* Uniform Rules—Courts of Appeal, Rule 1-3 ("The Courts of Appeal shall review issues that were submitted to the trial court and that are contained in specifications or assignments of error, unless the interest of justice requires otherwise."); *see also* La.Code Civ.P. art. 2129 ("An assignment of errors is not necessary in any appeal.")

## ANALYSIS

### I.     Standard of Review

The first assignment of error, regarding whether the trial court applied a locality standard of care or a national standard of care, determines the standard of review for the remaining issues before the court. If the trial court committed legal error, then this court reviews the factual findings under de novo review and makes its own independent review of the record. *Latour v. Steamboats, LLC*, 23-27 (La. 10/20/23), 371 So.3d 1026. If the trial court did not commit legal error, then the factual findings must be reviewed under "the manifest error—clearly wrong standard, which precludes the setting aside of a district court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety." *Hall v.*

*Folger Coffee Co.*, 03-1734, p. 9 (La. 4/14/04), 874 So.2d 90, 98. Under the manifest error standard of review, an appellate court is not permitted to weigh the evidence or substitute its own factual findings, even though it may have decided the case differently. *Stobart v. State through Dep't. of Transp. & Dev.*, 617 So.2d 880 (La.1993).

Louisiana Revised Statutes 9:2794(A)(1) sets forth the standard of care a plaintiff must prove in a medical malpractice claim:

> The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances [known as the "locality rule"]; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

No party disputes that the locality rule is inapplicable here, as Dr. Gates was a specialist in the field of obstetrics and gynecology. Rather, they dispute whether the trial court applied a locality standard of care or a national standard of care. Ms. Lachney claims that the trial court applied a locality standard, which was legal error and would require de novo review. Conversely, Dr. Gates asserts that the trial court did not apply a locality standard, but rather "merely ***addressed***" such a standard, which would require the manifest error standard of review (emphasis in original). While Dr. Gates admits that the trial court cited the locality rule in its written reasons, he points out that the court also cited the controlling standard for specialists.

Specifically, the trial judge stated in his written reasons: "In addressing the standard of care, medical specialists are held to a uniform standard of care based on

5

national standards existing with the specialty. *Gros v. LAMMICO*, 316 So.3d 61 (La. App. 1ˢᵗ Cir. 2020)." Yet, he also cited to the locality standard of care:

> The standard of care in a medical malpractice claim is based on a locality standard. In a malpractice action based on the negligence of a physician licensed in Louisiana, where the defendant practices in a specialty and the alleged acts of medical negligence raise issues peculiar to that specialty, the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within the same medical specialty.

The trial judge further noted that Defendant's experts, Dr. George Morris and Dr. Kerry Tynes, are admitted to practice in Louisiana, while Plaintiff's expert, Dr. Glenn Schattman, practiced in other areas of the country outside of Louisiana. After providing a review of all the expert evidence, the trial judge concluded:

> After careful consideration of the evidence and testimony presented at trial from Ms. Roxine Lachney, Dr. James Gates, Dr. Kerry Tynes, Dr. George Morris, and Dr. Glenn Schattman, the Court is satisfied that Dr. James Gates met this standard of care and Ms. Roxine Lachney gave well-informed consent to the procedures to which Dr. James Gates performed.

Although the trial judge's written reasons admittedly contain inconsistencies in reference to the standard of care, we find that, after considering the totality of his written reasons, he correctly applied a national standard of care. Furthermore, the evidence presented at trial is devoid of any suggestion or testimony that the locality rule applies. In fact, on cross examination, Dr. Gates agreed with Ms. Lachney's counsel that the standard of care in this case is a national standard of care. Simply put, the controlling standard of care was not in dispute at trial. In the trial judge's conclusion, he specifically mentioned that he carefully considered all the testimonial evidence at trial and did not state that he gave less weight to Dr. Glenn Schattman's opinion because of his location. Therefore, finding no legal error on behalf of the

6

trial court, we will review the factual issues before us under the manifest error standard of review.

## II.   Applicable Law

The Louisiana Supreme Court explained a plaintiff's burden of proof in a medical malpractice claim in *Fusilier v. Dauterive,* 00-0151, p. 7 (La. 7/14/00), 764 So.2d 74, 79:

> A physician is required to exercise that degree of skill ordinarily employed under similar circumstances by others in the profession and also to use reasonable care, diligence, and judgment. *Hastings v. Baton Rouge General Hospital,* 498 So.2d 713 (La.1986). A physician is not required to exercise the highest degree of care possible; rather, his duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. *Gordon v. Louisiana State University Board of Sup'rs,* 27,966 (La.App. 2 Cir. 3/1/96), 669 So.2d 736; *writ denied,* 96–1038 (La.5/31/96), 674 So.2d 263. In a medical malpractice action, the plaintiff has the burden of proving, by a preponderance of the evidence, (1) that the doctor's treatment fell below the standard of care expected of a physician in his medical specialty; and (2) the existence of a causal relationship between the alleged negligent treatment and the injury sustained. *Id.* (citing *White v. McCool,* 395 So.2d 774 (La.1981)).

"Informed consent is a claim that can be separate from a medical malpractice claim." *Patterson v. Peterson*, 19-1604, p. 7 (La.App. 1 Cir. 8/3/20), 310 So.3d 185, 190, *writ denied*, 20-1076 (La. 11/10/20), 303 So.3d 1041. Louisiana Revised Statutes 40:1157.1 sets forth the law on informed consent:

> A. Notwithstanding any other law to the contrary, written consent to medical treatment means the voluntary permission of a patient, through signature, marking, or affirmative action through electronic means pursuant to R.S. 40:1163.1, to any medical or surgical procedure or course of procedures which sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is evidenced by a signature, marking, or affirmative action

7

through electronic means, by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent, by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.

. . . .

D. In a suit against a physician or other health care provider involving a health care liability or medical malpractice claim which is based on the failure of the physician or other health care provider to disclose or adequately to disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or other health care provider, the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent.

"A physician is required to provide his patient with sufficient information to allow the patient to make an informed and intelligent decision on whether to submit to the proposed course of treatment." *Deykin v. Ochsner Clinic Found.*, 16-488, p. 11 (La.App. 5 Cir. 4/26/17), 219 So.3d 1234, 1242 (internal citations omitted). When lack of informed consent is raised, the burden of proof is as follows:

As in a case alleging breach of the medical standard of care, the plaintiff in an informed consent case bears the burden of proof. He must show: (1) the existence of a material risk which the physician must disclose; (2) the failure of the physician to inform the patient of a material risk; (3) the realization of the material risk; and (4) a causal connection between the failure to inform the patient of the risk and realization of the risk.

*Maybrier v. La. Med. Mut. Ins. Co.*, 08–1508, p. 4 (La.App. 3 Cir. 6/10/09), 12 So.3d 1115, 1119, *writ denied*, 09–1558 (La. 10/9/09), 18 So.3d 1287; *see also Labit v. Cobb*, 10-463 (La.App. 3 Cir. 11/3/10), 50 So.3d 267.

8

### III. Hysterectomy

Ms. Lachney's first three issues for review relate to the hysterectomy. Ms. Lachney alleges that Dr. Gates' failure to order diagnostic imaging or less invasive testing after suspecting adenomyosis, before proceeding with a "sterilizing total hysterectomy," was a deviation in the standard of care. Similarly, she alleges Dr. Gates breached the standard of care by failing to determine the cause of Ms. Lachney's abnormal bleeding prior to removing her uterus. There is no dispute that the pathology report revealed a normal uterus. Finally, she claims that Dr. Gates deviated from the standard of care by not allowing Ms. Lachney to wean off Depo-Provera prior to the hysterectomy.

Ms. Lachney first presented to Dr. Gates on January 23, 2013. His medical records state that she had a "boggy, tender retroflexed uterus consistent with adenomyosis." He wrote, "The patient is tired of the persistent bleeding. She wants no more children. She declines a Mirena IUD or NovaSure endometrial ablation. She wants definitive treatment which would be a vaginal hysterectomy with conservation of her ovaries." After signing the consent form, Ms. Lachney underwent the hysterectomy on February 4, 2013, with the pathology report showing a normal uterus with weakly proliferative endometrium and chronic cervicitis.

Defendant and Plaintiff put forth conflicting testimony at trial. Ms. Lachney denied that she told Dr. Gates she did not want any more children. She also testified that he did not discuss alternative types of treatment with her, and that if he had done so, she would have strongly considered those options. She testified that Dr. Gates told her that she needed a hysterectomy "because my uterus was flipped back and mushy" and because she could have difficulty with future childbirth.

In regard to the consent form, Ms. Lachney testified that it was presented to her by Dr. Gates's nurse and she was simply told to sign without anyone reviewing it with her. When defense counsel showed her the signed consent form at trial, she testified: "I don't understand what it says nor do I know what it means by looking at this, I just – I don't – I mean, if you tell me what this means – I don't know, I can't – I mean, understand what it even says."

Conversely, Dr. Gates testified at trial that he gave Ms. Lachney three options of treatment for her symptoms: an IUD, an endometrial ablation, and a hysterectomy. He explained, "If she wanted more children I would not have offered a vaginal hysterectomy . . . ." However, he said she rejected the more conservative options. He testified that he immediately dictates his notes after seeing patients and that he would not have notated things that did not occur.

Dr. Gates admitted that there were other diagnostic tests he could have done prior to surgery, but he believed further testing would not have changed anything because he performed the surgery due to her pain and bleeding.

Both Plaintiff and Defendants put forth experts. Plaintiff's expert, Dr. Glenn Schattman, found that Dr. Gates failed to sufficiently examine other alternative causes of Ms. Lachney's symptoms and believes an MRI should have been performed prior to the hysterectomy. He testified that Dr. Gates deviated from the standard of care by failing to perform alternative treatments or therapies to try and correct the abnormal bleeding before operating. Dr. Schattman further testified that Dr. Gates removed a completely normal uterus, and that had Dr. Gates not removed Ms. Lachney's uterus, she would not have had adhesions with the right and left ovary resulting in those future surgeries.

Both defense experts, Dr. Morris and Dr. Tynes, testified that Ms. Lachney consented to the hysterectomy and that her history did not warrant any additional testing, such as a biopsy, MRI, or saline sonogram, prior to the hysterectomy. Therefore, they did not find that Dr. Gates breached the standard of care in performing the hysterectomy on Ms. Lachney.

The evidence presented at trial on whether the standard of care was breached when Dr. Gates performed the hysterectomy on Ms. Lachney is conflicting. Under the manifest error of review, we are not entitled to weigh the evidence. Our review of the record shows ample evidence to support the trial court's findings that Dr. Gates properly obtained Ms. Lachney's consent prior to the hysterectomy and was not required to perform additional testing prior to the hysterectomy. The medical records, coupled with the testimony from Dr. Gates, Dr. Morris, and Dr. Tynes, support the trial court's findings. Therefore, it was not manifestly erroneous for the trial court to find that Dr. Gates did not breach the standard of care by performing the hysterectomy on Ms. Lachney.

**IV.  Right Oophorectomy**

Ms. Lachney next alleges that Dr. Gates breached the standard of care in performing a right salpingo-oophorectomy on Ms. Lachney. Specifically, she alleges that Dr. Gates did not obtain valid informed consent prior to performing the surgery, nor did he perform a thorough workup and evaluation of alternative non-gynecological causes of pelvic pain.

The surgery at issue was performed on November 25, 2013. The consent forms indicated that Ms. Lachney would be undergoing a laparoscopy not for sterilization and a cystoscopy, not a right oophorectomy. The consent form for the laparoscopy stated: "A laparoscopy not for sterilization may be done only for the

purpose of diagnosis, which means that it is not being done for treatment of any disease or condition, but only to help the doctor find out if any disease or abnormality is present." It did not indicate that removal of the right ovary was a risk or known complication. Similarly, the cystoscopy consent form did not state the possibility of an ovary removal. When asked at trial why the consent forms did not mention the risk of removal of an ovary, Dr. Gates replied:

> Because at that stage, we didn't have at the office anymore the consent that I used on the vaginal hysterectomy, the one that we like that lists everything. Hindsight being 20/20 I wish we had that but this is a form that the Louisiana Medical Society had approved by it's – it's – this is a[n] incomplete form but once again, go back to my H and P [history and physical] and you'll see everything.

In a medical record dated three days before the surgery, Dr. Gates noted that Ms. Lachney "understands the possible risks of bleeding, infection, injury to bladder, bowels, or blood vessels, or anesthetic complications. Despite this, she is willing to undergo the procedure." Similarly, another medical record stated the possibility of an ovary being removed and that such was discussed with Ms. Lachney.

At trial, Ms. Lachney testified that she did not know that Dr. Gates was going to remove her right ovary. She thought she was having scar tissue removal and a scope put in to look at her pelvic organs. She only found out about the ovary removal after surgery when Dr. Gates allegedly told her that it was "smothered with scar tissue and it was shriveled." Just as with the hysterectomy consent form, she testified that Dr. Gates did not go over the consent form with her for this surgery and that a nurse presented the form to her to sign.

Dr. Gates admitted that he was not planning on taking the ovary out, and only did so after opening her up and finding the ovary covered in scar tissue. Dr. Gates further admitted that the consent form was "suboptimal" and that he wished he had

written "lysis of adhesions, cystectomy – ovarian cystectomy oophorectomy" on the form.

Dr. Schattman testified that the consent form was legally flawed and thus the surgery and subsequent removal of her right ovary was a deviation in the standard of care. He also testified that "removing an ovary that's polycystic would not be within the standard of care for this procedure." Finally, he testified that there was nothing in the pathology report that justified removing Ms. Lachney's right ovary.

Conversely, Dr. Morris testified that Ms. Lachney's pain prior to the surgery was "new pain" that did not respond to treatment, which justified surgery including the possibility of an oophorectomy. Although the consent form did not explicitly state the procedure would be an oophorectomy, he pointed out that the form did state that it included "other indicated procedures," which could include an oophorectomy. Furthermore, Dr. Gates's history of present illness medical record indicated that he discussed with Ms. Lachney the possibility of an oophorectomy. Dr. Morris found that Dr. Gates did not breach the standard of care by removing Ms. Lachney's right ovary. Similarly, Dr. Tynes testified that Dr. Gates did not breach the standard of care by removing Ms. Lachney's right ovary.

Although the consent form did not specifically mention the right oophorectomy, it did list the scope of consent as including "other indicated procedures." That medical record, coupled with the medical record indicating that Dr. Gates verbally discussed the possibility of removing an ovary with Ms. Lachney, supports the trial court's conclusion that Ms. Lachney did give informed consent to Dr. Gates for the surgery, including the removal of her right ovary. Under the manifest error of review, we find that the trial court was not clearly wrong in finding

that Dr. Gates did not breach the standard of care in removing Ms. Lachney's right ovary.

## V.       Left Oophorectomy

Lastly, Ms. Lachney argues that Dr. Gates deviated from the standard of care by performing a left-salpingo oophorectomy, in which pathology revealed a benign follicular cyst of the ovary with no significant pathology alteration.

Dr. Gates performed the left oophorectomy on Ms. Lachney on June 6, 2014. Prior to surgery, Dr. Gates noted that Ms. Lachney's left ovary was polycystic and seven centimeters, which is abnormally large for an ovary. During the surgery, Dr. Gates perforated her bowel which caused a vesicovaginal fistula and severe complications. Because of the complications, Ms. Lachney had to undergo two additional surgeries and wear a colostomy bag for several months.

As with the other surgeries at issue in this appeal, the evidence presented at trial is in conflict regarding both the scope of consent and the medical reason for surgery. Ms. Lachney testified that Dr. Gates told her she had a cyst on her left ovary the size of a lemon, and that if she did not remove it, it could rupture and cause her to die. She testified that Dr. Gates did not discuss any alternative treatments other than surgery, nor did he discuss the implications of removal of the left ovary, which would be premature menopause. However, she does admit to signing the consent form, though she said the nurse presented it to her and told her where to sign. She testified that Dr. Gates did not tell her that her problem may be associated with something other than a gynecological problem.

Dr. Gates explained his reasoning in removing her left ovary:

> After I had an informed consent with the patient telling her in so doing, she would have to go on hormone replacement therapy. She knew good and well going into the surgery we were going to remove the ovary

because that's where the problems – that's where all her pain was coming from.

Plaintiff's expert, Dr. Schattman, testified that the seven centimeter large cyst had resolved by the time of surgery, as those cysts "come and go all the time," and thus Dr. Gates deviated in the standard of care by removing a normal ovary.

Defense experts, Dr. Tynes and Dr. Morris, found that because the cystic ovary was growing and Ms. Lachney was tired of chronic pain, the removal of the ovary was proper and not a deviation from the standard of care. Dr. Morris testified that Ms. Lachney signed the consent form for this procedure, and that the risks of fistula and leakage of urine or bowel contents from the vagina were contained in the record. He did not find that the procedure was done incorrectly or below the standard of care. The fact that she developed complications after the surgery did not indicate that Dr. Gates breached the standard of care. Dr. Morris and Dr. Tynes also testified that the standard of care did not require Dr. Gates to have a colorectal surgeon present during the left oophorectomy.

Although we sympathize with Ms. Lachney for the serious complications and health issues she endured following the left oophorectomy, we do not find that the trial court manifestly erred in finding no breach in the standard of the care. The undisputed evidence shows that Ms. Lachney consented to removal of the left ovary, and the fistula complication, though unfortunate, was a known risk and not an indication of a breach.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed against Appellant, Roxine Lachney.

**AFFIRMED.**